ROBERT J. ROBERTS ET AL. *v.* THE W. H. HUGHES COMPANY ET AL.

Special Term at Rutland, November, 1909.

Present: ROWELL, C. J., MUNSON, WATSON, HASELTON, and POWERS, JJ.

Opinion filed June 10, 1912.

*Corporations—Foreign Corporations—Right to Sue and Defend —Ultra Vires Acts—Rights of Creditors—Receivership in Foreign Jurisdiction—Effect—Suspension of Corporate Functions—Corporate Mortgage Bonds—Value Received— Bona Fide Holder — Mortgages—Delivery — Failure to Record — Priority — Estoppel—Pleading—Proof — Waiver —Husband and Wife—Wife's Right to Proceeds of Insurance on Husband's Life—Fraudulent Conveyances—Fraud of Grantor—Fraud in Law—Voluntary Conveyances—Bona Fide Purchasers—Corporate Stock—Transfer—Principal and Surety—Rights of Sureties—Bills and Notes—Consideration — Sufficiency—Bankruptcy—Equity—Final Decree—Effect and Defaulted Defendants.*

A foreign corporation that has not complied with P. S. 774, 776, prohibiting a foreign corporation from doing business in this State without having first procured a designated certificate, and providing that no such corporation shall "maintain any action in this State upon any contract made by it in this State, unless, prior to the making of such contract, it has procured such certificate," may defend a suit brought against it, and in that defence may maintain the validity of an executed contract made by it in this State, or the validity of a conveyance made to it in fulfilment thereof, for the statute affects only the enforcement of such contract, not its validity.

The rule that knowledge of the president or managing official of a corporation is imputed to it is founded on the assumption that the official is the agent of the corporation and bound to communicate the knowledge to his principal, and so has no application to the knowledge of such official affecting a transaction wherein he is contracting with the corporation on his own account, and wherein

he manifestly continues to act for himself until he executes and delivers to the corporation a conveyance of his property, although he is one of the officers authorized to issue to himself stock constituting the main consideration of the conveyance.

The creditors of a grantor may avoid his voluntary conveyance for the fraud of the grantor alone, regardless of the knowledge of the grantee.

A mortgagee who does not seasonably record his mortgage may have his lien defeated by a subsequent conveyance for value to a purchaser without notice, but a subsequent grantee without notice, who gave no consideration, cannot gain priority by an earlier record.

The fraud of a voluntary grantor may be merely the fraud that the law imputes to him from the condition of his estate and the necessary consequences of his act.

A corporation is a legal entity distinct from its stockholders, and the courts will ordinarily maintain that distinction, even though all the stock is owned by one person; but in cases of fraud a court may treat a corporation and its stockholders as identical.

Where an insolvent procures a corporation to be formed and transfers to it his property in exchange for its stock, the corporation is not a *bona fide* purchaser as against the creditors of the insolvent.

Where a person engaged in business became financially embarrassed and obtained a large loan by giving mortgages that were not recorded, and thereafter procured a corporation to be formed of which he was at once made a director and the president, and to which he conveyed the mortgaged property, and his other property of great value, in exchange for substantially all of the corporate stock and the avails of the remainder in cash, which was never paid, and one of the mortgagees was also a director of the corporation, and a third director knew of the unrecorded mortgages, but the remaining two stockholders and directors had no knowledge thereof, the mortgagor in effect conveyed all the property to himself, and the corporation was but an instrumentality to enable him to hold his property and continue his business in the name of the corporation, which was not a purchaser for value, but held the mortgaged property subject to the unrecorded mortgages.

Where a trustee in bankruptcy, before he sold at auction corporate stock that had belonged to the bankrupt, announced all the facts connected with the history thereof, including the existence of un-

recorded mortgages on the bankrupt's property at the time he conveyed it to the corporation in exchange for the stock, the purchaser acquired no better title to the stock than the bankrupt had, for the trustee took the estate subject to liens and equities not declared void by the bankruptcy act.

The vendee of a *bona fide* purchaser as against equitable rights is also a *bona fide* purchaser, regardless of his knowledge of those rights.

One is a holder for value only when he parts with value at the time of the transaction on the faith of the transfer.

A finding that a certificate of corporate stock was taken by a bank to secure an overdraft by the owner of the stock means that the certificate was taken to secure an existing indebtedness, and so the bank was not a holder for value as against equitable rights under an unrecorded mortgage.

A finding that a certificate of corporate stock was taken by a bank as collateral security for the payment of notes indorsed by the owner of the stock means that the certificate was taken at the time the bank discounted the notes, thereby making it a holder for value as against equitable rights under an unrecorded mortgage, the burden being on the mortgagee to procure a more definite finding.

Where a court of a sister state appointed a receiver of a corporation owning lands in this State, no order of that court authorizing the issuance of receiver's certificates to provide for the payment of wages of the receiver's employees can impose a lien on the lands in this State as against rights under an unrecorded mortgage.

The rights of priority of purchasers of bonds of a corporation secured by a trust deed are not dependent on the state of the record at the time of the purchase, but are to be determined by the conditions that existed when the trust deed was recorded, for whatever the trustee can claim under the deed inures to the benefit of those for whom he holds the title.

An order of court appointing a receiver of a corporation, made on petition of its directors for the dissolution thereof, and directing the corporation to transfer its property to the receiver, suspends all corporate action, deprives the officers of the corporation of all authority, and terminates an unexecuted authority conferred by a prior vote of the directors.

Though neither the appointment by a court of a sister state of a receiver of a corporation owning lands in this State, made on petition of the directors of the corporation for its dissolution, nor the terms of the order of appointment, nor any authority conferred on

that court or the receiver by the statutes of the sister state, can affect the title of the corporation to the lands in this State, yet that court, by virtue of its jurisdiction over the corporation and its directors, may compel the transfer to the receiver of the title to such lands, and hence the order appointing the receiver and directing the corporation to transfer its property to him is effective to prevent any corporate or official action that would enlarge an incumbrance on the lands in this State.

The delivery of bonds of a corporation as collateral to certificates of the receiver of the corporation, issued to provide for the payment of the indebtedness of the corporation, is so irregular as to put the purchaser on inquiry and charge it with notice of facts involved in the issuance of the bonds and affecting their validity, regardless of whether the delivery is by the receiver or by the attorney of the corporation.

Although the transferee of corporate mortgage bonds is presumed, in the absence of evidence to the contrary, to be a *bona fide* purchaser for value, yet a bank to which another bank transfers the certificates of the receiver of a corporation and corporate mortgage bonds pledged as collateral therefor, but void because issued after the appointment of the receiver and during the time corporate functions were suspended, is not a *bona fide* purchaser, and acquires no rights to the bonds, for it is charged with notice of the order under which the certificates were issued and of the fact that the bonds were pledged by the corporation whose debt was provided for by the certificates.

A mortgagee who, without disclosing the lien of his unrecorded mortgage, participated with the mortgagor in forming a corporation, and procuring a conveyance to it of the mortgaged property by the mortgagor in exchange for its stock, so as to enable the mortgagor to hold his property and continue his business in the name of the corporation, is not estopped, as against the mortgagor and the corporation, from asserting the lien of his unrecorded mortgage.

A mortgagee, without disclosing the lien of his unrecorded mortgage of real estate, participated with the mortgagor in forming a corporation, and procuring a conveyance to it of the mortgaged property by the mortgagor in exchange for its stock, though he had reason to believe that some of the directors and stockholders were ignorant of the existence of the mortgage, and subsequently joined in executing an instrument that declared that a mortgage then given by the corporation to secure its bonds was a first lien

on all the property of the corporation. The bonds were invalid because issued when the corporate functions were suspended in consequence of an order of court appointing a receiver of the corporation, and they were issued to secure certificates issued by the receiver to provide for the payment of corporate indebtedness; but the circumstances were such that the corporation is estopped from asserting the invalidity of the transaction. *Held*, that the mortgagee is estopped from asserting that the bonds are not a lien on the mortgaged premises, prior to the lien of his mortgage, as security for the debt evidenced by the receiver's certificates; but the estoppel does not extend to a loan to meet the expenses of the receiver not within the scope of the vote of the directors directing the pledging of the bonds.

Where one provides money for the legitimate uses of a corporation, though under an arrangement that it has no authority to make, equity will award him proper relief where his remedy at law is not adequate.

The fact that two of three indorsers whose liability was secured by a mortgage relied in part on the third indorser to look after their interest in connection with the transaction, and he consented that the mortgage might be left unrecorded, subjected them only to the ordinary consequences of failure to record a mortgage.

The money paid at the maturity of an insurance policy on the life of a husband belonged to his wife where, at the time the husband procured the insurance, he agreed with his wife that the amount of the policy at its maturity should belong to her, and for more than twenty years she kept boarders, doing all of the business, including the purchasing and collecting, and paid the premiums from the yearly savings from that business, it being agreed between her and her husband that he would turn over to her from his earnings a designated sum of money monthly for the support of the family, and that she should have the savings from the boarding business, and the receipts from that business were deposited in a bank in the husband's name, and such of the bills for supplies as were charged, and the insurance premiums were paid therefrom by his checks.

Where several persons indorsed notes for the benefit of another on his agreement to give them security therefor, which he did by executing a mortgage for the benefit of them all and delivering it to one of them, all of them were entitled to the benefit of the mortgage without a finding that the agreement designated of what the

security should consist, or that all of the several persons had knowledge of the mortgage.

Where several persons indorsed notes for the benefit of another on his agreement to give them security therefor, which he did by executing a mortgage for the benefit of them all and delivering it to one of them, the mortgage was sufficiently delivered to be effective for the benefit of all.

Where a person received notes in consideration of a contract binding him to procure loans on other notes of the maker indorsed by others, and he indorsed some of those notes and procured loans thereon as agreed, and his failure to procure loans on the other notes was excused by the bankruptcy of the maker, the notes that he received in consideration of his services were supported by a sufficient consideration.

A final decree on the merits in a suit in equity determines the rights of defaulted defendants just as it would if the bill had not been taken as confessed as to them.

Where the findings of a master show that a party has failed to discharge the burden resting on him of showing that corporate stock was acquired by the adverse party with notice of equities or without paying value therefor, this Court's disposition of that issue on appeal is a conclusion of law, and not an inference of fact.

There is a limit to the presumptions that will be made on review in support of a judgment, the rule being that this Court will presume in favor of the judgment that the trial court inferred such facts from those certified up as it ought to have inferred, or as it fairly might have inferred.

The fact that the statutes of a sister state make the wages of employees of a corporation a preferred claim in receivership proceedings does not make the bonds of the corporation pledged to secure certificates of the receiver appointed by a court in that state valid, if unlawfully issued, nor create a lien on the property of the corporation in this State mortgaged, together with other property of the corporation, to secure the bonds.

The fact that a party claims a larger estoppel than the court allows does not deprive him of such estoppel to the extent that the case warrants.

It is a common procedure in equity to permit amendments of pleadings to correspond with the case as tried, and where a feature of estoppel was involved in the issues tried, an amendment of the answer setting up the estoppel is allowed in this Court.

A request to have a report recommitted to a master, based wholly on the failure of the parties to anticipate certain lines of decision by the court, as to the correctness of which no question is made, will not be granted where the recommittal will involve a new trial of a large part of the case, and sanction a change to new lines of inquiry resting wholly on facts known at the time of the trial.

APPEAL IN CHANCERY. Heard on the pleadings, master's report, and defendants' exceptions thereto, at the March Term, 1909, Rutland County, *Waterman*, Chancellor. Decree for all the orators. The defendants appealed. The opinion states the case.

*T. W. Moloney, H. L. Clark* and *S. E. Everts* for the orators.

*O. M. Barber* and *J. B. McCormick* for the defendants.

MUNSON, J. In the fall of 1901, W. H. Hughes of Granville, N. Y., a manufacturer of roofing slate operating quarries in Pawlet and Wells in this State, became embarrassed financially, and applied to D. D. Woodard, President of the Granville National Bank, for a loan of $30,000. Negotiations followed which resulted in an arrangement between Woodard, W. H. Hughes, his mother, Sarah Hughes, a resident of Easton, Pa., and Robert J. Roberts and his wife Ann, residents of Pawlet, that W. H. Hughes and his wife should execute notes for $30,000, that Sarah Hughes should indorse one-third of that amount and Roberts and his wife one-third, that W. H. Hughes should give the indorsers security, and that Woodard should procure the money. There was a further agreement between W. H. Hughes and Woodard, that Woodard should carry the remaining $10,000 without indorsers and continue the entire loan for two years, and that in consideration thereof Hughes should give Woodard twenty-four notes of $200 each. The notes so arranged for were delivered to Woodard on or about November 27, 1901, and those making up the $30,000 were discounted and the avails thereof paid to W. H. Hughes. Nothing was paid upon these by the

makers, and they were finally taken up by the indorsers above named, who now hold them.

On the same twenty-seventh day of November, W. H. Hughes executed to Sarah Hughes, Robert J. Roberts and Ann Roberts, an assignment of a lease of certain quarry rights in Pawlet, and a mortgage of certain parcels of land in Pawlet and Wells, to secure them for their indorsements. At the time these papers were executed and delivered, Hughes suggested that they be left in the possession of Woodard for the benefit of the mortgagees, because the recording of them might injure his credit. No objection being made by Robert J. Roberts, the only one of the mortgagees present, Woodard took the papers and placed them in his safe, and they remained there until July 13, 1903, the day Hughes made his assignment as hereinafter stated, when Woodard handed them to Roberts, who took them to the clerk's office for record. The assignment and the mortgage were recorded in Pawlet, July 14, 1903, and the mortgage was recorded in Wells, December 19, 1904.

In the fall of 1902 W. H. Hughes began to confer with John Gilroy, his counsel, the orator Robert J., who was a foreman in his employ, and others, as to the advisability of forming a corporation to take his property and carry on the business; and on the second day of April, 1903, a certificate of incorporation of the W. H. Hughes Company was filed in the office of the Secretary of State at Albany. W. H. Hughes and Robert J. Roberts were two of the five persons named therein as directors for the first year. The capital stock was to consist of 2,500 shares of $100 each, 2,430 of which were subscribed for by Hughes, 25 by Roberts, and the remainder by the three other directors. The officers of the corporation were elected at a meeting of the directors held April sixth, W. H. Hughes being chosen president. At a meeting of the stockholders held April ninth, Hughes offered his property for 2,430 shares of stock and $7,000 in cash, with possession from May first; and the president and treasurer were thereupon authorized to issue 2,430 shares of the capital stock to W. H. Hughes upon his delivering to the treasurer a deed and assignment of leases of his slate property. The value of the property at this time is not found, but its value fifteen months later is put at $95,000. A warranty deed of the property was executed to the W. H. Hughes Company, April tenth, 1903, and was recorded in the clerk's office of Pawlet, May second, 1903,

but was not recorded in Wells. This sale and transfer covered the property embraced in the mortgage and assignment given to Sarah Hughes, Robert J. Roberts and Ann Roberts as before stated.

April 29, 1903, the W. H. Hughes Company authorized the execution of a mortgage of its entire property to the Security Trust Company of Troy, N. Y., to secure an issue of its bonds to the amount of $100,000; and the mortgage so authorized was executed May 1, 1903, and was recorded in Pawlet, May second. There was an early issue of $32,000 of bonds, as to which no question arises. There was a subsequent issue of bonds amounting to $18,000, authorized as hereinafter stated, which were placed with the Adirondack Trust Company as security for funds obtained for the payment of employees; and this indebtedness and collateral are now held by the Farmers' National Bank.

The 2,430 shares of stock voted to Hughes were issued to him April 30, 1903. Twenty-five shares had already been issued to Roberts. The only others who held stock previous to May second were the remaining directors—H. J. Stevens, the treasurer, W. C. Clark, the secretary, who was Hughes' clerk, and E. C. Whittimore. There was an original issue of ten shares to Stevens, and one of five shares to Clark. The report states, in separate findings, that the only consideration for the Stevens issue was service rendered in the organization of the company, and that the only consideration for the Clark issue was service rendered to Hughes in the organization of the company. There was also an issue of 25 shares to Whittimore, of which ten shares and five shares were transferred to Stevens and Clark respectively on the following day. In connection with this issuance and transfer, Whittimore credited Hughes $1,000 on an old note, and Stevens gave Hughes a check for $1,000. Nothing further appears regarding the matter of consideration.

The company went into business in Vermont, May second, 1903. The only person then holding stock, other than those above named, was D. D. Woodard, who received on that day a transfer from Hughes of fifty shares. From May fourth to July seventh Hughes made about fifty transfers of stock, covering nearly all his holding. Four hundred forty-seven shares went to about 35 different persons, in amounts ranging from one to fifty. Five hundred shares were transferred to Sarah Hughes, May sixth, and 760 shares July seventh. The Farmers' National

Bank received 250 shares May eleventh as collateral on notes indorsed by Hughes, and July seventh it received 100 shares to secure an overdraft. There was a further transfer on July seventh of 360 shares to H. B. Nelson.

W. H. Hughes made an assignment for the benefit of his creditors July 13, 1903; and C. C. Van Kirk was appointed trustee of his estate in bankruptcy in the following September. His assets and liabilities are not given, but it appears incidentally that his estate paid about sixteen cents on the dollar. Sarah Hughes was adjudged a bankrupt on her own petition September 10, 1903, and Frank Reeder was appointed trustee of her estate on the twentieth. Her estate paid her debts in full, including her $10,000 liability on the W. H. Hughes notes, and on receiving her discharge these notes were reassigned to her. Van Kirk received as a part of the W. H. Hughes estate 1,645 shares of the capital stock of the W. H. Hughes Company, and sold them at auction June 21, 1904, for $33,900, to one who bid by the direction of Eugene R. Norton, in behalf of said Eugene, his brother James E. Norton and certain others, all of whom are still holders of the stock. The Sarah Hughes claim and the Roberts claim were each reduced by the sum of $1,650.80, received from the trustee of W. H. Hughes.

The day after Hughes made his assignment the directors of the W. H. Hughes Company took measures looking to the appointment of a receiver and a voluntary dissolution of the corporation, and their petition in that behalf was filed July 16, and Ellis Williams was appointed receiver on the 18th. Williams was subsequently appointed receiver in ancillary proceedings in this State, and January 9, 1904, he procured a certificate of authority for the corporation to do business in this State, none having been had before this. The dissolution proceedings and the receivership were closed soon after the Nortons obtained control of the corporation by their purchase of the Hughes stock.

The original bill was brought by Robert J. Roberts, Ann Roberts and the trustee in bankruptcy of Sarah Hughes, and was filed January 27, 1904. The defendants were Ellis Williams as receiver of the W. H. Hughes Company, C. C. Van Kirk as trustee of W. H. Hughes, bankrupt, the administrators of W. H. Hughes then deceased, the Security Trust Company, the Farmers' National Bank, and many others, holders of the bonds or stock of the W. H. Hughes Company. The W. H.

Hughes Company, and Eugene R. Norton and James E. Norton were brought in by a supplemental bill filed July 12, 1904. Sarah Hughes was admitted as an oratrix on her supplemental bill filed January 20, 1908. The only parties now defending are the W. H. Hughes Company, the Norton brothers, and the Farmers' National Bank. The bill sets up that the W. H. Hughes Company took its conveyance with notice of the rights of the orators, and prays for a foreclosure of the equities of all persons entitled to redeem the premises from the mortgages of the orators, or that the property be sold and the proceeds distributed among the parties entitled thereto. The answers of the contesting defendants deny the priority of the orators' lien, claim that the orators are estopped from asserting it, and allege that the orators' assignment and mortgage were withheld from the record to defraud the defendant company. The master's report negatives the existence of any fraudulent purpose on the part of the orators.

The orators contend that the defendant company cannot assert its title against their unrecorded conveyances because of its failure to procure a certificate of authority to do business in this State before taking its deed. Our statute provides that no foreign corporation, with certain exceptions, shall do business in this State without having first procurred from the secretary of state a certificate that it has complied with the requirements of law in that behalf, and that its business is such as a Vermont corporation, incorporated for a like business, may lawfully carry on; and which provides further that no such corporation shall "maintain any action in this State upon any contract made by it in this State, unless, prior to the making of such contract, it has procured such certificate." P. S. 774, 776.

The W. H. Hughes Company is not here seeking to maintain an action, but is here as a defendant; and it is held that a foreign corporation which is prohibited from maintaining a suit may defend one brought against it. *J. R. Alsing Co.* v. *New England Quartz etc. Co.*, 174 N. Y. 536, 66 N. E. 1110; *Swift* v. *Platte,* 68 Kan. 1, 72 Pac. 271, 74 Pac. 635. The orators' brief treats the transaction between Hughes and the Company as an executed contract, as it evidently is; and it is held that a prohibition of this character will not prevent the corporation from maintaining or defending suits to protect its rights under a contract fully executed. 19 Cyc. 1303; *Mobile Electric Lighting Co.* v. *Rust,*

117 Ala. 680, 23 So. 751.  Our statute prevents the enforcement of the contract, but does not declare the contract void.  The deed to the defendant company was an effective transfer of the title, and the company may protect the rights thus acquired. To hold otherwise would be to subject the property of the corporation to forfeiture at the instance and for the benefit of a private party.

The orators claim that the corporation is chargeable with the knowledge that Hughes had of the existence of their unrecorded conveyances; and as the matters connected with the issuance of the stock had not occurred at the time the purchase of the Hughes' property was voted and the deed to the company executed, we take up the question independently of its relation to the character of the incorporation.  It may be stated as a general rule that notice to the president or other managing official of a corporation is notice to the corporation.  This is upon the ground that the official is the agent of the corporation, and that it is his duty to communicate the knowledge to his principal. The rule has no application when the transaction is one in which the official is dealing with the corporation on his own account. He is not then a representative of the corporation, but a party contracting with the corporation as represented by others.  His independent and adverse attitude is an essential and manifest feature of the transaction.  In this case, it was necessarily understood that Hughes would continue to act for himself until he had executed and delivered the deed which the company was to receive.  As he was not the agent to make the purchase, his knowledge was not the knowledge of the company.  Note 6 Ann. Cas. 680; *Wickersham* v. *Chicago Zinc Co.,* 18 Kan. 481, 26 Am. Rep. 784; *Barnes* v. *Trenton Gas Light Co.,* 27 N. J. Eq. 33; *Frenkel* v. *Hudson,* 82 Ala. 158, 2 So. 758, 60 Am. Rep. 736. The fact that he was one of the officials authorized to issue the stock which constituted the main consideration did not affect his relation to the transaction itself.

But the orators contend that the defendant company, if not chargeable with Hughes' knowledge, holds the property subject to their lien because not a purchaser for value.  When a conveyance is without consideration, the grantee's want of knowledge is immaterial, and creditors may avoid it for the fraud of the grantor alone.  Note 14 Am. St. Rep. 748; See *Wilson* v. *Spear,* 68 Vt. 145, 34 Atl. 429; *Fairhaven Marble etc. Co.* v.

*Owens,* 69 Vt. 246, 37 Atl. 749; *Corey* v. *Morrill,* 71 Vt. 51, 57, 42 Atl. 976. By leaving their conveyances unrecorded, the orators took the risk of having their lien defeated by a subsequent conveyance to a purchaser for value without notice; but a subsequent grantee who gave no consideration could not gain priority by an earlier record. Pom. Eq. Jur. §759. See *Downs* v. *Belden,* 46 Vt. 674. It sufficiently appears that Hughes was insolvent when he deeded to the Hughes Company, and if the corporation is to be treated as the holder of a voluntary conveyance, it has no equity equal to that of the orators. The absence of a finding that Hughes intended to defraud the orators or his creditors generally is immaterial. The fraud of a voluntary grantor may be merely the fraud which the law imputes to him from the condition of his estate and the necessary consequence of his act. *Wilson* v. *Spear,* 68 Vt. 145, 34 Atl. 429.

It is true that a corporation is a legal entity which is entirely distinct from the individuals who compose it, and that the courts will ordinarily maintain this distinction, even when all the stock of the corporation is owned by one individual. But the courts will not permit this doctrine to become a shield for the contrivers of fraudulent schemes. It has even been said that in an appropriate case, and in furtherance of the ends of justice, a debtor corporation and the individual owning all its stock and assets will be treated as identical, independent of any question of fraud. *Potts* v. *Schmucker,* 84 Md. 535, 36 Atl. 592, 35 L. R. A. 392, 57 Am. St. Rep. 415. But cases of this class, in which the individual is held liable merely because he owns all the stock of the corporation, have been spoken of as of doubtful authority. Cook Cor. §664. However this may be, there is ample authority for saying that in cases of fraud the courts will look behind the corporation to the individuals composing it. The business of an individual or partnership is often continued through the formation of a corporation, and the transfer to it of the property of the individual or partnership in exchange for the stock of the corporation. A fraud upon creditors may be effected by this process as well as by a conveyance to an individual, and when the one who makes use of it is insolvent the corporation issuing the stock for the property will not be treated as a *bona fide* purchaser. *Booth* v. *Bruce,* 33 N. Y. 139, 88 Am. Dec. 372; *Metcalf* v. *Arnold,* 100 Ala. 180, 20 So. 301, 55 Am. St. Rep.

24; *Kellogg* v. *Douglas County Bank,* 58 Kan. 43, 48 Pac. 587, 62 Am. St. Rep. 597.

The fact that a small amount of the stock is held by persons other than the debtor will not be permitted to stand in the way of a creditor's relief. The existence of a certain number of directors is necessary to the organization of a corporation, and this requires that a few shares of the stock be held by others. It has been repeatedly said that the relief will be granted when the debtor owns substantially all the stock. Cook on Cor., 6th Ed., §663; *First National Bank* v. *Trebein,* 59 O. St. 316, 52 N. E. 834; *In re Rieger,* 157 Fed. 609; *Blair* v. *St. Louis etc. R. Co.,* 22 Fed. 36; *Gormully etc. Co.* v. *Biltz,* 64 Fed. 612; *Hoffman Steam Coal Co.* v. *Cumberland Coal & Iron Co.,* 16 Md. 456, 77 Am. Dec. 311. In the case last cited, Sherman and Dean, the persons whose acts were in question, owned 4,996 shares out of 5,000; the ownership of one of the other shares was shown to be unreal; and the court considered it no violent presumption that the ownership of the remaining shares was the same. Upon this statement, the court said the corporation was but a contrivance whereby the same property was held by the same parties under a different name, and that in conveying to the corporation the grantors were but conveying to themselves. In *Potts* v. *Schmucker,* above cited, the court reviewed this case, and said of it that the court looked through the disguise of a corporation in which Sherman and Dean had clothed themselves, and proceeded to deal with the case precisely as though the title to the land had not been conveyed by Sherman and Dean to the corporation, but still stood in their names.

We have seen that two of the five stockholders and directors of the defendant company, Hughes and Roberts, were parties to the unrecorded transfers. Of the remaining three, Clark is found to have had knowledge of the transfers, but apparently on certain hearsay evidence; while Stevens and Whittimore are found to have had no knowledge of them. Twenty shares went to Stevens and ten to Whittimore; and we have seen that Whittimore credited Hughes $1,000 on an old note. The only cash shown to have been paid on account of stock was that paid by Stevens, who gave Hughes a check for $1,000. It does not appear that the corporation received any benefit from this payment by way of entries on its books. The report says that the ten shares issued to Stevens for his services in connection with

the organization was the only stock, other than that issued to Hughes, for which the company received consideration. Nothing appears to indicate the value of Stevens' services except what can be gathered from the record of the proceedings, and this discloses nothing from which the court would be justified in saying that they were a substantial consideration for the stock he received on that account. The arrangement was, in effect, that Hughes should have 2,430 shares of stock and the avails of the remainder—$7,000 in cash. The report says that the $7,000 which Hughes was to have in cash was not paid. Upon these facts we think it must be considered that the corporation was but an instrumentality for enabling Hughes to hold his property and continue his business in another name and a different manner; that in conveying his property to the corporation he was in effect deeding it to himself; and that the corporation, in exchanging its stock for his property, was but returning his property in a different form. The property which he at first held by title he afterwards held through the stock. In this situation, the defendant company is not entitled to be treated as a purchaser for value.

But Hughes' deed was effective to convey the property to the corporation subject to the orators' lien, and this property is represented by the capital stock. It is not claimed but that the corporation was legally organized and the stock regularly issued. The stockholders, as owners of their several shares, are independent of the corporation and of each other, and their interests must be separately considered. All the stock held by contesting defendants was transferred from the original issues to W. H. Hughes. All transfers were regularly entered on the books of the corporation. It appears from the report that the holders of certain certificates, representing stock transferred directly from Hughes, and covering 357 shares, are not shown to have had knowledge of the orators' mortgage and assignment. None of these parties are defending, and nothing appears as to any change in the ownership of their stock.

We have seen that 1,645 shares of stock were sold by the trustee of Hughes' estate. At the time of the sale the orators' papers had been on record in Pawlet over a year. Eugene R. Norton, by whose direction the stock was bid off, had been given all the details of the transaction by Roberts as early as September, 1903. The trustee made public announcement of the facts

before making the sale, and it is found that all the purchasers of stock at this sale knew of the orators' mortgage and assignment. Having bought from Hughes' estate with this knowledge, they can stand in no better position than Hughes did. The trustee took the estate subject to all liens and equities not declared void by the act. 5 Cyc. 341; *Thompson* v. *Fairbanks,* 196 U. S. 516, 49 L. Ed. 577, 25 Sup. Ct. 306.

Eugene R. Norton has, in addition to his stock purchased at the trustee's sale, three certificates, covering fifteen shares, which were transferred to him in April and May and on June 14, 1904, by persons who received them before the orators' mortgage and assignment were recorded, and who are not shown to have had notice of them. As to these shares, Norton's rights are those of a *bona fide* purchaser; for when a person with notice buys of one who was without notice, he succeeds to all the rights of the one from whom he takes the title. Pom. Eq. Jur. 754; *Barber* v. *Richardson,* 57 Vt. 408.

We have seen that a certificate for 250 shares and another for 100 shares are held by the Farmers' National Bank as security. The master says he is unable to find that when these shares were taken any officer of the bank had notice of the existence of the orator's mortgage and assignment. It is found, however, that the smaller certificate was taken to secure an overdraft, and we construe this to mean that it was taken to secure an existing indebtedness. One is a holder for value within the meaning of the rule only when he parts with value at the time of the transaction and on the faith of the purchase or transfer. 10 Cyc. 636, 637; *Downs* v. *Belden,* 46 Vt. 674. The report says that the larger certificate was taken as collateral security on certain notes indorsed by Hughes. We understand this to mean that it was taken at the time the notes were discounted. If the construction is open to doubt, the burden was on the orators to procure a more definite finding.

Fifty shares of the Hughes stock were transferred to D. D. Woodard, who had knowledge of the conveyances in question; and it is apparent from the facts reported that these were not included in the trustee's sale. This would leave thirteen shares of the Hughes stock undisposed of, while according to the list of transfers the remainder should be thirty-eight shares. However the difference may be reconciled, it is clear that the remain-

ing shares are either. in Hughes' estate or in the hands of persons who are not defending.

July 18, 1903, Williams, as receiver in New York, was authorized to issue receiver's certificates to the amount of $10,000, to provide for the payment of the June wages of the company's employees, and August 15, 1903, he was authorized to issue additional certificates to the amount of $4,000 to pay the wages of the receiver's employees and the current expenses of the receivership. Both orders were made on notice to the Security Trust Company. Neither contained any provision purporting to give the certificates priority over existing liens. It appears from the report and the exhibits that the $14,000 obtained on these certificates was furnished by the Adirondack Trust Company, and was, either wholly or in part, the loan for which the $18,000 of bonds before referred to were placed with that company as collateral. The defendants claim that these bonds are a lien prior to the claim asserted by the orators.

The first question arises in connection with the issuance of the certificate for $10,000. It is not necessary to inquire as to the power of a court to give priority to a loan authorized for the payment of pre-existing labor claims in the case of a corporation of this character, nor as to the effect of an order which does not express an intention to give priority. No such question of priority can arise here. The lien which the orators are seeking to establish is confined to lands in this State, and no action of the New York court could impose a lien on lands lying outside its territorial jurisdiction. Story Con. Laws, §543; *Bullock* v. *Bullock*, 52 N. J. Eq. 561, 30 Atl. 676, 27 L. R. A. 213, 46 Am. St. Rep. 528. If the Farmers' Bank has any right superior to that claimed by the orators, as regards the $10,000 loan, it must be through the bonds held as collateral, and not by force of the certificate.

When these bonds were negotiated the orators' mortgage and assignment had been on record in Pawlet four days. If the rule applicable to one who takes title by deed is applicable here, as the orators claim, both the Adirondack Trust Company and the Farmers' National Bank took the bonds with constructive notice of the orators' mortgage. But it is clear that the rule is not applicable. The relations of the bondholder to the trust deed are such that his rights are not dependent upon the condition of the record title at the time of his purchase. The trustee

for the bondholders is the grantee in the deed and the owner of the estate conveyed, and the rights of priority are to be determined by the conditions which existed when its deed was recorded. Whatever the trustee can claim under the deed inures to the benefit of those for whom it holds the title. The scheme of the loan contemplates the issuance of bonds from time to time as their sale can be effected in the general market. In the absence of express provision to the contrary, the entire issue is referred to the date of the mortgage, regardless of the time of sale. It follows that bonds legally issued, and received without actual notice of incumbrances created subsequent to the mortgage, are a lien prior to such incumbrances, although issued at a later date. *Central Trust Co.* v. *Continental Iron Works,* (N. J.) 28 Atl. 595, 40 Am. St. Rep. 539; *Camden etc. Co.* v. *Burlington Carpet Co.,* (N. J.) 33 Atl. 479; *Pittsburg etc. Ry. Co.* v. *Long Island etc. Co.,* 172 U. S. 493, 514, 43 L. Ed. 528, 535, 19 Sup. Ct. 238.

So it is necessary to inquire whether there was a valid issue and authorized use of the bonds; and for the consideration of this question a further statement of facts is necessary. The assignment of W. H. Hughes was announced at a special directors' meeting held in the forenoon of July 14th, and it was thereupon voted that the board go to Saratoga to confer with Edgar T. Brackett with the view of employing him as counsel for the company, and the board then adjourned to meet at Saratoga that evening. At this adjourned meeting it was voted to proceed for the appointment of a receiver, either in voluntary dissolution, or by a bill in equity, or such other method as would effectively conserve the property and interests of the company, and that Edgar T. Brackett be employed as counsel to take such steps as were necessary to accomplish this result. The board then adjourned to meet July 16th at the office of the company, and at this meeting the treasurer reported that there were not sufficient funds on hand to meet the pay-roll due the 18th, and it was thereupon voted that W. C. Clark be authorized and instructed to sell the stock of slate on hand, or to obtain a loan of $10,000 to meet the pay-roll and give a mortgage on the slate and place as collateral to said mortgage as many bonds as were necessary to secure such loan. On this same day the directors' application for a voluntary dissolution of the corporation—the same on which the receiver was afterwards appointed—was filed

in the Supreme Court. The meeting of the 16th was adjourned to the 17th, and it was then voted that W. C. Clark be instructed to go to Saratoga that evening, and "confer with Senator Brackett with the view of obtaining a loan of $10,000 to meet the coming pay-roll, and that he be authorized to sign and execute such papers and place as collateral thereto such bonds" as were "necessary to obtain such loan." These facts appear from the company's record book, which is found to be a full and correct statement of the transactions of the corporation, and is made a part of the report. The receiver was appointed July 18th, upon the application above mentioned, on motion of Edgar T. Brackett, counsel for the applicants; and the order of appointment recited that the wages of the employees became due and payable that day, and authorized the raising of $10,000 on receiver's certificates "to be forthwith applied to the payment of said wages." The master reports that the bonds "were negotiated with Senator Brackett for the Adirondack Trust Company as security for funds obtained to meet the July pay-roll and some other obligations, amounting to $14,000, as shown by" the orders authorizing the certificates. The separation, as regards authorization and date, of the two loans combined in this condensed statement, appears from our previous recital of the papers referred to. We have nothing further regarding the transaction. Nothing appears regarding the corporation laws of New York, the statutory powers of the court in receivership matters, or the status of the pay-roll in such cases. It does not appear that the court proceeded any further in adjusting the affairs of the corporation. After the Norton interest obtained a majority of the stock, the corporation assumed the payment of its obligations, and the dissolution proceedings and receivership were closed. Nothing appears as to the terms or requirements of the final order. The master says regarding these bonds: "I understand there is a stipulation on file in reference to the bonds and the bond-holders, but it has not been submitted to me." No reference to such a stipulation has been made by counsel.

The orators do not question the legality of the meeting at which the use of the bonds was authorized. The only objection made to the sufficiency of the vote is that it was taken when all the directors were aware of the orators' claim. It is not necessary to consider this objection as regards either fact or law.

No claim is made but that the bonds were properly certified by the trustee. The real contention of the orators is that the bonds are invalid because not issued until after the receiver was appointed. The claim of the defendants is that the directors' votes of the 16th and 17th placed these bonds under the security of the trust deed. There is no finding of the master or suggestion of counsel as to the exact time of the issue. The records show what Clark was authorized to do with the bonds, and when he was directed to proceed on his mission, but there is no finding as to what he actually did. We know nothing of any conference between Clark and Brackett on the evening of the 17th or later, and the report is silent as to the precise manner in which the loan was effected. The only finding regarding this is that the bonds were negotiated with Senator Brackett for the Trust Company as security for the funds obtained to meet the obligations provided for by the orders of the court. The fair meaning of this is that the bonds were negotiated to the Trust Company in connection with the delivery of the certificate. The defendants' brief claims no other construction for the finding. With the case standing thus, the issuance of the bonds cannot be separated from the procurement of the money by the receiver. They were pledged as collateral to the receiver's certificate, and there could be no receiver's certificate until after the receiver was appointed. This fixes the date of the issue at a time subsequent to the inception of the receivership.

The order of appointment directed the corporation to transfer its property to the receiver, but contained no order enjoining the exercise of its corporate functions. No such order was needed. The appointment of a receiver over a corporation generally suspends all corporate action, and deprives its officers and agents of all authority over its property. High Rec. §290; *Linville* v. *Hadden*, 88 Md. 594, 41 Atl. 1097, 43 L. R. A. 222; *Lenoir* v. *Linville Imp. Co.*, 126 N. C. 922, 51 L. R. A. 146, 36 S. E. 185; *Treat* v. *Penn. etc. Co.*, 199 Pa. St. 326, 85 Am. St. Rep. 788, 49 Atl. 84. There would seem to be no question as to the application of this doctrine to dissolution proceedings had on petition of the directors. The origin and purpose of such proceedings are inconsistent with the recognition of any subsequent action of the directors affecting the status of the property. But the taking of such action was in fact prohibited; for the order to transfer the property to the receiver forthwith was in

effect an order to transfer the property as it then was. Clark could do nothing by virtue of his authorization that could not have been done by the corporation at the time he acted. An unexecuted authority conferred by an earlier vote of the directors must fall with the termination of the power of the corporation over the subject matter. See Story Agency, §§462, 481. So the vote which otherwise would have authorized the delivery of the bonds was deprived of its effect by the intervening action of the court,—unless a different conclusion is required by the fact that the mortgaged property was outside the court's territorial jurisdiction.

The fact that all the property covered by the trust deed is real estate in Vermont, or chattels located here which the deed provides shall be treated as real estate, does not restrict the effect of the order. It is true that neither the appointment of the receiver, the terms of the order making the appointment, nor any authority conferred upon the court or receiver by the New York statutes, could affect the title to this property. See *Fall* v. *Eastin,* 215 U. S. 1, 54 L. Ed. 65, 30 Sup. Ct. 3, 23 L. R. A. (N. S.) 924, 17 Ann. Cas. 853. But the New York court, by virtue of its jurisdiction over the corporation and its directors, could have compelled the transfer of the title to the receiver. Having this power, the order it made must have been effective to prevent any corporate or official action which would have enlarged the incumbrance on the property. The want of power in the court to create a further lien upon the property does not imply an inability to prevent the corporation from doing it. The propriety of this view is apparent when we consider that the administration of the whole estate and the final marshalling and distribution of the assets is through the domiciliary receivership. See upon the general subject. *Massie* v. *Watts,* 6 Cranch 148, 3 L. Ed. 181; *Burnley* v. *Stevenson,* 24 O. St. 474, 15 Am. Rep. 621; *Kimball* v. *St. Louis etc. Ry. Co.,* 157 Mass. 7, 34 Am. St. Rep. 250, 31 N. E. 697. There is no question here as to the protection of creditors of the corporation residing in this State. The appointment of the receiver having been operative as a restraining order, and there being no limitation of its effect by reason of the location of the incumbered property, it must be held that the bonds were improperly issued.

Our next inquiry is whether the bonds are held *bona fide.* The bonds were received and are held as collateral security for

$10,000 which were obtained and used to pay an unquestioned indebtedness of the corporation. The Adirondack Trust Company was a purchaser for value, but it cannot be said that it took the bonds without notice of the invalidity of the issue. It seems clear that the delivery of the bonds as collateral to a receiver's certificate, whether delivered by the receiver or by the attorney of the corporation, was enough to put the purchaser on inquiry as to the circumstances in which they were issued, and charge it with knowledge of the fact that the actual issuance of the bonds was after the receiver was appointed.

We think the Farmers' National Bank stands in no better position than the Adirondack Trust Company. It is true that the transferee of a bond is presumed, in the absence of evidence to the contrary, to be a *bona fide* holder for value, and that the only finding regarding the bank's acquirement of the bonds is that they "were subsequently transferred" to it as collateral security for the $14,000. But the indebtedness secured was evidenced by receiver's certificates, and the original creditor's receipt of the bonds would have, in ordinary course, no earlier date than the certificates themselves. The bank was charged with knowledge of the order under which the certificates were issued, and this precluded the supposition that the bonds were used by the receiver under an order of the court. The only natural inference left was that the bonds were pledged by the corporation whose debt was being provided for. So the bonds must be considered invalid in the hands of the Farmers' National Bank. As regards this branch of the case, no separate consideration of the later certificate and the additional loan of $4,000 need be had.

We come now to the question of estoppel. The defendants contend that Roberts is estopped from asserting his claim against the W. H. Hughes Company by participating in the proceedings connected with the purchase of the Hughes property without mentioning his lien. This contention is disposed of by the view we have taken of the character of the incorporation. It is certain that Roberts was not estopped from asserting his claim against Hughes. No more is he estopped from asserting it against the corporation which took Hughes' title without paying value.

The case presents the further question whether the orators or any of them are estopped from asserting the invalidity of the

bonds, and this requires a further statement regarding Roberts' conduct as a director. · Before voting to mortgage its property, the Hughes Company employed Mr. Gilroy, an attorney, to examine the title; and at a stockholders' meeting held on the 29th of April, which was attended by the five directors, who were the only stockholders, Gilroy reported that he found the title clear of incumbrances. A written consent to the execution of the mortgage, which declared it to be a first lien on all the property of the company, real and personal, and was signed by all the stockholders, was presented at the same meeting; and it was thereupon voted that the mortgage be given, and that the consent be spread on the record. Roberts then submitted the form of a bond and moved its adoption, which was agreed to. The mortgage recited that the consent of the stockholders was recorded in the office of the clerk of the county of Washington, and in the offices of the town clerks in the towns of Wells and Pawlet in the State of Vermont. The bonds were styled "first mortgage bonds" in both the deed and the bond.

It is not necessary to inquire as to the admissibility of the evidence on which the master finds that Roberts did not hear Gilroy's statement that the property was unincumbered, and that if he did hear it he did not understand it. The question here is not whether he heard something said that required him to speak, but whether something was being done that required him to speak. He knew that an examination of the records would not disclose the existence of his mortgage without hearing a report to that effect. The rejection of this finding would not invalidate the other findings as to the part taken by Roberts in the business of that meeting.

It will be remembered that as the case stands a majority of the body in which Roberts was acting, although not *bona fide* holders of stock, were without knowledge of the orators' lien. Knowing that he held this unrecorded mortgage, and having at least some reason to believe that three of his associates did not know it, Roberts took part without objection in all the proceedings by which the property of the company was mortgaged to secure its prospective creditors. In the course of these proceedings he joined with the other stockholders in executing a paper which declared that the mortgage then given was a first lien on all the real estate of the company. This was not only a material statement, but it was embodied in a writing which was an essen-

tial part of the process by which the funds were to be obtained. Moreover, this writing was to be recorded in public offices, and the attention of the public was to be directed to it by a reference in the deed. In signing a paper of this character for such a use and purpose, Roberts must be taken to have understood the effect of the material statements contained in it. He must also be taken to have intended that the statements should be acted upon, for that intent inhered in the nature of the transaction. There is no need of a direct finding that the party taking the bonds had knowledge of and relied upon any particular feature of Roberts' conduct. The issuance of further bonds under the security of the trust deed was in itself a representation of their priority over the orators' lien; and it is to be presumed that the holder was induced to purchase by the advantages of the opportunity as presented. The course of the orator Roberts was calculated to induce persons to invest their money in the bonds when it is reasonable to suppose that they would not have done so if they had known that there was an unrecorded prior incumbrance on the property. He not only concurred in authorizing the trust deed as above stated, but took part in the corporate action by which the issue in question was directed. If that issue was sufficiently effective to sustain an estoppel, it is clear that Roberts is brought within the application of the rule.

We have held that this issue of bonds was invalid, and that the purchaser and its transferee were charged with knowledge of the fact which made the issue invalid. The invalidity, however, was not due to any original want of power in the corporation, but to a suspension of its functions resulting from an order of the court. The prohibition of corporate action was not expressed in terms, but was a result which followed the order of appointment by force of law. So knowledge of the impeaching fact was not the same as knowledge of the invalidity. There is nothing here to justify the conclusion that the Adirondack Company was acting in bad faith. No question touching the moral quality of the act is involved. The transaction was not one expressly or impliedly prohibited by charter or statute. There was no failure to comply with any requirement essential to its validity. The want of authority was due to a power which intervened between the inception and completion of the corporate action. The bonds were issued in disregard of an implied injunction, through the instrumentality of an officer or other agent

of the corporation, in pursuance of a vote of the directors, proper in form and valid when taken, which was deprived of vitality by the appointment of a receiver before the bonds were delivered to the pledgee.

It is not necessary to enter into any general discussion of the law applicable to the unauthorized acts of private corporations. It is enough to say that the law recognizes in appropriate cases the equities of one who has provided money for the legitimate uses of a corporation, although under an arrangement which the corporation had no authority to make; and that when the nature of the case is such that remedies at law would be ineffectual, equity will afford such other relief as the case may require. If the pay-roll of the Hughes Company had been a secured claim, and the transaction with the corporation a loan · without security, the Adirondack Company would have been subrogated to the rights of the creditors whose claims had been thus satisfied. 3 Pom. Eq. Jur., §1300. Where the directors of a corporation had raised money for the legitimate purposes of the company by an issue of certain bonds prohibited by the statute, it was held in dissolution proceedings that so far as the money raised on the bonds had been applied in paying off debts which would not otherwise have been paid, those who advanced the money should be reimbursed before anything was paid to the stockholders. *Re Cork etc. Ry. Co.*, L. R. A. 4 Ch. 748, 760, 761. In this case the loan was to the receiver for the benefit of the corporation, and the transaction between the corporation and the lender was a mere pledging of bonds as collateral to the loan. So if relief is to be afforded here it must be through an enforcement of the pledge.

The pay-roll provided for by the money advanced on the faith of these bonds was the only general indebtedness of the Hughes Company existing at the time the orators' papers were placed on record. If other persons became unsecured creditors during the four days which intervened before the appointment of the receiver, they are not here complaining. As against the stock, the pay-roll and the bonds stand the same. Neither the trustee of the bondholders nor any holder of the first issue is defending. Neither the corporation nor any minority stockholder is questioning the validity of the bonds. The corporation could not question their validity if it would. The case leaves these bonds outstanding in the hands of the Farmers' National

Bank as security for the money obtained on a receiver's certificate to meet the company's pay-roll. This amounts to an affirmative finding that there was no judicial adjustment of the affairs of the corporation covering the loan evidenced by the certificate. It follows that when the corporation took back its property from the court upon an undertaking to pay its obligations, it assumed the payment of the loan for which it had pledged the bonds. So in this suit in equity, in determining the rights of the orators and the defendant bank, the bonds will be treated as good against the corporation until redeemed by the repayment of the loan. It may safely be said that there are no other equities to be considered when the bondholders of the first issue, the trustee of the bondholders, the general creditors if any, and the stockholders as such, are content.

This discussion has been had to aid us in determining whether Roberts is estopped from asserting the invalidity of the issue. When a director whose private interests are involved in the affairs of the corporation takes part in the procurement of money for the corporation by a transaction which is invalid because of a suspension of the powers of the corporation, and the circumstances are such that the corporation is estopped from asserting the invalidity of the transaction, it is difficult to see how the director who is responsible for this position of the corporation can assert the invalidity for his own benefit. In *Moss* v. *Averill,* 10 N. Y. 449, the defendant had signed the contract and notes in question as president of the corporation, and the court held that he was estopped from denying the validity of the transaction; saying that his act amounted to an assertion that the corporation had a right to make the purchase and that the proper managing agents of the corporation had authorized it to be made, and that to hold otherwise would work great injustice to the other contracting party and enable the defendant to make a profit out of his own wrong. We think Roberts is estopped from saying that these bonds are not a lien on the mortgaged premises prior to his claim, as security for the $10,000 loan.

But we think the estoppel goes no further. The $4,000 loan was not obtained to provide for any liabilities incurred by the corporation. A loan to meet the receiver's expenses was not within the scope of the vote which directed the pledging of the bonds. There is nothing to show that the corporation, or

any officer or member of it, had any part in the attempt to bring this loan under the security of the bonds. Roberts' part in the various matters relating to the trust deed and the bonds ought not to make him responsible for a use of the bonds which was not only unauthorized, but was to procure money for the payment of debts not incurred by the corporation.

It is not necessary to consider Roberts' conduct as a director as bearing on the rights of the purchasers of the Hughes' stock. We have seen that Eugene R. Norton holds fifteen shares as a *bona fide* purchaser, and that the holders of 357 shares, regularly transferred, are not shown to have had knowledge of the orators' conveyances or to hold without paying value. These last are not defending, but the status of their shares will be determined by the holding regarding the fifteen shares of Norton. *Kopper* v. *Dyer*, 59 Vt. 447, 489, 9 Atl. 4, 59 Am. Rep. 742. The rights of the holders of this stock are superior to the equities of the orators, and as to them the defence of estoppel is unimportant. On the other hand, those who took their stock directly from Hughes' estate with actual notice of the orators' unrecorded conveyances are not in a position to say that they have been injured by Roberts' conduct as a director, and so cannot avail themselves of this defence. With this stock must be classed the holdings of those who took their stock at the organization with knowledge of the orators' lien or without paying value.

The conduct of Roberts cannot operate as an estoppel on Mrs. Roberts or Mrs. Hughes. The facts that they relied in part on Roberts to look after their interests in connection with the transaction in which their notes were given, and that Roberts consented that the conveyances taken as security might be left unrecorded, did not subject them to anything beyond the ordinary consequences of a failure to record.

The oratrix Ann Roberts claims a separate interest in the decree prayed for. Two thousand dollars of the note indorsed by Robert J. Roberts and his wife were paid from the avails of a bank note signed by both, and this note was paid out of the proceeds of the sale of certain real estate bought by the wife in May, 1903, upon which $1,050 had been paid out of $3,000 received from a policy of insurance on the life of the husband issued in 1888. One thousand five hundred dollars more of the insurance money was used in paying a mortgage of $8,000 on real estate of the husband, given for money used in taking up

the indorsed note. When the insurance was obtained it was understood between the husband and wife that the amount payable at the maturity of the policy should belong to the wife. For over twenty years Mrs. Roberts kept boarders, doing all the business, including the purchasing and collecting. It was understood and agreed between Roberts and his wife that he would turn over to her from his earnings forty dollars a month towards the support of the family, and that she should have what was saved from the money paid by the boarders. The receipts from the boarders were deposited in the bank in the husband's name, and such of the bills for supplies as were charged, and the insurance premiums, were paid therefrom by his checks. The yearly savings from the boarding business were sufficient to pay and did pay the insurance premiums. All payments made and received in connection with the insurance were made and received by the husband. All business matters in which they were jointly interested were kept in his name. Upon these facts the master submits the question whether any part of the indorsed notes was paid by Mrs. Roberts.

We think the findings bring the case within the decision in *Potter* v. *Potter*, 64 Vt. 298, 23 Atl. 856. There the wife's invalid father came to reside in the family on an understanding between her and her husband that whatever was paid for his care and nursing should be hers; and it was held that when a husband allows his wife to earn property during coverture the right to reduce it to possession does not exist, and that the presentation and allowance of the claim in the name of the husband will not make it his property. The cases cited by the defendants are not authority to the contrary. In most of them there was no finding of an arrangement between the husband and wife. In considering questions touching the effect of possession and the rights of creditors, a distinction must be made between gifts of existing property and the rights which spring from a permission given the wife to earn for her benefit. The fund in question never belonged to the husband. It came into existence as the property of the wife.

The defendants insist that there can be no decree covering the interest claimed by Mrs. Hughes. They argue from the report that she had no knowledge of the existence of the mortgage and assignment until after the failure, and contend that there was no legitimate evidence of an agreement for the execu-

tion of such papers. It is not necessary to inquire as to the admissibility or sufficiency of the evidence from which the master has found that there was such an agreement. The report makes Mrs. Hughes a party to an agreement by which she and others were to indorse certain notes for the benefit of her son and he was to give them security. Security having been given for her benefit under that agreement, and delivered to a person whom she relied upon to look after the business, she is entitled to the benefit of that security without a finding that the agreement specified what the security should consist of, or that she had personal knowledge of the deed and assignment. It is claimed in this connection that there was no acceptance of the deed and assignment by Mrs. Hughes or Mrs. Roberts. It is found that after the execution of the papers they were delivered by Hughes to either Everts or Roberts, but that before the parties separated they were handed to Woodard for safe keeping. This, in connection with the findings that the arrangement to which Mrs. Hughes and Mrs. Roberts were parties provided that the indorsers should have security and that they apparently left the whole matter to Hughes, Woodard and Roberts, is enough to show an acceptance in behalf of the grantees who were not present.

It is also claimed that Mrs. Hughes' estate received the purchase price of the shares transferred to her by W. H. Hughes shortly before his assignment and afterwards sold by the trustee of his estate in bankruptcy, and that this should preclude her from asserting her claim against the purchasers of the stock. Exhibit 18, which is referred to in this connection, was received for a purpose not connected with this question, and is elsewhere claimed by the defendants not to have been admissible for any purpose, and without this exhibit there is nothing in the case that even tends to show that the facts were as stated.

The defendants insist that if Mrs. Hughes prevails the amount of her claim should be reduced by $4,800, the amount Hughes paid to Woodard on notes given him for his services and undertaking in connection with the loan. It is said that no consideration for these notes appears, and that Woodard did not carry out his contract regarding the loan, and that it was Mrs. Hughes' duty to compel him to indorse the amount of his notes on the notes she was to pay. It appears that Woodward indorsed the $20,000 of notes indorsed by the orators, and procured the

money by discounting them at different banks, and indorsed the renewal notes by which the loan was kept on foot. These facts show a consideration for the notes he received. *Ricker* v. *Clark,* 54 Vt. 289. His failure to proceed under the contract for the full time, if there was such failure, was excused by the bankruptcy of Hughes.

The defendant excepted to certain findings based wholly or in part on the testimony of Robert J. Roberts and his appearance as noted by the master, on the ground that he was made an incompetent witness by the death of the other contracting party. The findings pointed out under this exception, other than one already considered, are in substance that Roberts and his wife were friendly to Hughes, had confidence in him, and were willing to do anything they could to assist him; that Roberts speaks broken English, and as a witness seemed somewhat troubled to understand; and that he did not hear the reason Hughes gave for not wanting the papers recorded. The court has made no use of any of these findings, and it may be said of all of them except the last, that they are not of a kind that could have influenced the master in reaching his ultimate and controlling conclusions. The finding that Roberts did not hear Hughes' reason for not wanting the papers recorded might have been the basis of the finding that Roberts had no fraudulent intent in permitting them to remain unrecorded, but that possibility is negatived by the statement that no facts are found on the testimony of Roberts that are not specifically stated to have been so found.

*Decree reversed and cause remanded with mandate that a decree be entered adjudging that as against the W. H. Hughes Company the conveyances of W. H. Hughes to the orators are an incumbrance prior to his deed to said company; that eighteen hundred and sixty (1,860) shares of the stock of the W. H. Hughes Company are held subject to the rights of the orators; that the trust deed of the W. H. Hughes Company and the bond issue of $32,000 are prior to the lien of the orators, but that as to the orators the bonds subsequently issued are invalid; that the orator Robert J. Roberts is estopped from asserting this invalidity as against the $10,000 loan; that the oratrix Ann*

*Roberts has a separate interest of $2,550 in the decree; and that the orators have a decree of foreclosure in accordance with their several interests and rights as herein determined.*

WATSON and POWERS, JJ., dissent from the holding that Robert J. Roberts is estopped.

### MOTIONS FOR REHEARING.

The majority opinion in this case was read at the opening of the October Term in 1911, and the opinion and accompanying mandate were thereupon handed to counsel without directing an entry, to afford an opportunity for any suggestions which counsel might desire to make. No one representing the defendants being in attendance, the case was held open until the close of the term and then entered with the court.

The orators Robert J. Roberts and Ann Roberts now move for a reconsideration and revision of the conclusions of the Court and the proposed mandate in three respects; one relating to the effect of a decree heretofore entered on default in the court of chancery against the defendants interested only as holders of stock transferred from Hughes; one as to the effect which should be given to the final decree as regards such holders, if treated as still in the case, in the absence of a finding that they were holders for value; one regarding the construction given by this Court to that part of the report which relates to the 250 shares taken by the Farmers' Bank as collateral security on certain notes.

The defendants move for a rehearing, and an opportunity to make further showing if necessary, in respect to three points; first, as to the construction given by the Court to the term "overdraft" as used by the master with reference to the 100 shares placed with the Farmers' Bank as collateral; second, as to the holding of the Court that the receivership proceedings, and the order made therein for an immediate transfer of the property to the receiver, deprived the corporation of the power to issue further bonds; third, as to the failure of the court to recognize the pay-roll as a preferred claim, which could have been established as a lien upon the property prior to the orators' mortgage.

This Court was aware that a decree of the court of chancery had been taken against defendant stockholders who had not ap-

peared, although no special claim regarding it was made in argument; and such stockholders were treated simply as parties not defending. No reference to this decree was made in the orators' briefs. The decree and a subsequent modification thereof, as these were said to appear from the files, were recited in the defendants' brief; and it was afterwards said of these in the brief: "A decree hereinbefore referred to against such stockholding defendants has been entered, and some advantage to orators may be claimed to accrue therefrom; we do not conceive what. Said decree was upon service by publication, and if effective has entirely destroyed the value of such stockholding defendants' stock."

We think the settled law applicable to *pro confesso* decrees against some of several defendants jointly charged justified us in treating these stockholders as we did. Our own case of *Kopper* v. *Dyer*, 59 Vt. 447, 9 Atl. 4, 59 Am. Rep. 742, was the only authority cited, but there are numerous decisions to the same effect. The nature, propriety and effect of such a decree are fully presented in *Frow* v. *De La Vega*, 15 Wall. 552, 21 L. Ed. 60. The final decree on the merits determines the rights of the defaulted defendants the same as if no decree *pro confesso* had been entered. The view of the case taken in the opinion leaves no ground on which it can be said that the interest of E. R. Norton as holder of the 15 shares and the interests of the defaulted stockholders are distinct. Both are treated as holders for value without notice.

But the orators say there is no evidence or finding that Norton as the holder of 15 shares, or any of the other owners of stock, were holders for value, and that it must be presumed in support of the decree for the orators that the chancellor inferred from the facts reported that they were not. The orators assume that the action of the Court is a reversal of an inference of fact drawn by the chancellor, but this is an error. The opinion proceeds upon the theory that the burden was on the orators to show that the stock was taken with notice or without paying value; and the orators having failed to meet this burden, the Court's disposition of the matter was a conclusion of law and not an inference of fact.

The orators urge that the finding regarding the 250 shares should not be given, for the purpose of reversal, a construction different from that of the court below. The finding is that these

shares were taken as collateral security on two notes of Robert R. Jones indorsed by Hughes. The natural and obvious construction is that the collateral was put up to procure the discount of the notes mentioned, and there was nothing in the case from which the court could infer anything different. There is a limit to the presumptions that will be made in support of a judgment. The rule is that this Court will presume in favor of the judgment that the court below inferred such facts from those certified up as it ought to have inferred, or as it fairly might have inferred. *Pratt* v. *Page,* 32 Vt. 13; *Chamberlain* v. *Whitney,* 65 Vt. 488, 27 Atl. 72.

It appears from an affidavit of counsel accompanying the orators' motion that in the trial of the case the orators relied upon the decree of the court of chancery as being in force, and as relieving them from the necessity of procuring any findings as to the good faith of the stockholders purchasing from Hughes. It appears further from the brief submitted by the orators that they tried the case upon the theory that the company had taken the property with notice, and that the defendant stockholders, as purchasers of the stock of a corporation charged with notice, had the burden of showing that they had suffered from the purchase; and that in consequence of this no attempt was made by the orators to secure and present the facts in relation to these defendants. Whether these misapprehensions should, in the circumstances, entitle the orators to some further opportunity may be left for later consideration.

It appears also from the orators' brief that counsel construed the finding as to the 250 shares as a finding that the stock was pledged to secure an existing indebtedness, and so did not apply to the master for a more definite finding; and they therefore request that the report be recommitted to the master for a more definite statement of his finding upon the evidence already before him. The consideration of this request may also be deferred. But the orators' brief concludes with a request that, if the case is returned to the master on any ground, the recommittal may cover all their points.

The first objection raised by the defendants relates to the holding regarding the 100 shares which are found to have been taken to secure an overdraft. No distinction was made in argument between the two blocks of stock. The orators treated both as having been taken to secure existing debts. The defendants

treated both as held in good faith for a valuable consideration. The defendants now present the definitions of an overdraft given by standard dictionaries, and claim that the Court was not justified in its construction of the term. But after giving these definitions due consideration, we still think that a simple statement that stock was taken to secure "an overdraft" indicates that it was taken to make provision for an existing condition.

It is said that the question of the effect of the receivership proceedings upon the power of the corporation to issue its bonds as collateral to receiver's certificates was not raised in the trial below nor in the argument made here; and that the briefs submitted nowhere raise or discuss any question touching the validity of the issue made. We confine our consideration of this objection to what appears in the master's report and the briefs; and the matters recited must be viewed in connection with the fact that no question was raised at any stage of the proceedings as to the validity of the $32,000 issue. The master says: "I am requested by both parties to make certain findings relative to the Hughes Company bonding its property," and he thereupon refers to the records of the company as a correct statement of its doings, and reports the further facts set up in the majority opinion as to the manner in which the bonds were negotiated. The orators' brief, after claiming that their lien is prior to any lien of the Farmers' Bank represented by these bonds, and that the answer of the bank shows that it took them pending the litigation and therefore with notice, proceeds: "Moreover the bonds were issued as collateral to certificates" to which the court did not attempt to give priority, "and were issued to the Adirondack Trust Company after the appointment of the receiver; * *''; and later, but in the same connection, refers to the $32,000 issue as bonds against which no question is made. The presentation of the claim regarding the subsequent issue is meager, but accurate. The use of the word "moreover" characterizes the matters following as further grounds for questioning the validity of the collateral security as plainly as if this were stated in so many words. The defendants evidently understood that the validity of these bonds was in question. Their argument upon the subject opens with the proposition that the mortgage bonds pledged to the Adirondack Trust Company to secure the advancement made by it to the Hughes Company, or its receiver, are valid and secured by the trust mortgage. In speaking of the author-

ity given the receiver to borrow money on his certificates, it refers to the contemporaneous order on the corporation that it forthwith execute and deliver to the receiver a conveyance and transfer of all its property, and proceeds as follows: "Equity will presume that to be done which ought to have been done, and that the property was thereupon immediately conveyed to the receiver." It refers to the votes taken in the directors' meetings of the 16th and 17th, and says that this corporate action must have placed the $18,000 of bonds under the security of the trust deed. It seems clear that if the power of the corporation to issue these bonds was not argued in terms, it was necessarily involved in matters which were argued. It is evident that the parties were presenting the case under the general law relating to receiverships, without considering that there were statutory provisions in New York affecting their rights. The defendants' present claim that the corporation had the power to issue these bonds after the appointment of the receiver, is based upon various sections of the New York statutes attached to their motion, and not otherwise before the Court.

It is agreed on all sides that no fact, claim or suggestion touching the status of the pay-roll appeared in the case as submitted to the Court. The defendants now refer in support of their motion to a section of the New York statutes, and offer to show that the wages of the employees was a preferred claim. If this were shown, it would not make the bonds valid if unlawfully issued, nor create a lien upon the mortgaged property. It might give the holders of the bonds an equity which would enable the court to work out a remedy on other lines. The claim of the defendants amounts to this—that they have a line of defence of which they did not avail themselves on the trial, because of their failure to anticipate the Court's disposition of some of the questions involved in matters necessarily for consideration. Some of the reasons which lead courts to look with disfavor upon applications of this kind are indicated in *Morgan* v. *Houston*, 25 Vt. 570.

The orators do not make the Court's treatment of the question of estoppel a basis of their motion, but they incidentally suggest the possibility that the Court may now be able to agree upon the views announced by the minority. The majority would willingly treat this suggestion as an application and act accordingly, if satisfied that they were in error. But after a careful

reading of the minority opinion, which was prepared after the majority opinion was promulgated, we see no reason to change our view. In touching upon this matter we confine ourselves to what appears from the report and the exhibits. The transcript was not referred to, and it does not appear that any exceptions to the report were filed by the orators.

The dissenting opinion stands upon the ground that the defendants neither pleaded nor claimed in argument the estoppel found by the Court; and that the Court was bound to presume in support of the decree that the chancellor inferred that the bonds were pledged by the receiver. The defendants, for obvious reasons, sought to make Roberts' conduct estop all the orators from asserting priority over Hughes' deed to the defendant company. But the facts of Roberts' conduct had another and very obvious bearing. The delivery and acceptance of the Hughes deed are assumed by the votes of April 29th, and nothing appears to give them an earlier date. So the completion of the purchase and the authorization of the trust deed and bonds were both transactions of the meeting which acted on Gilroy's report that the title was clear. The entire records of the stockholders' and directors' meetings, which showed Roberts' attendance and action and covered copies of the papers connected with the trust deed, were referred to and found correct; but, not content with this, the defendants requested and procured an insertion in the report itself of the facts that Roberts was present at all the stockholders' and directors' meetings until the receivership, which included the directors' meetings of July 16th and 17th; that he signed the consent to the mortgage, which declared that it would be a first lien on all the real estate; and that he moved the form of the bond, which contained the statement that it was a first mortgage bond. The defendants' brief, while attempting to make the estoppel sustain the priority of the defendant company's title deed, argues this group of subsequent facts as bearing upon Roberts alone, in a way which could not fail to suggest their true relation to the case. And in a subsequent part of the brief, where the claims of the defendant bank are specially considered, it is said to make strongly against the orators' claim of priority as regards these bonds, that the orator Robert J. Roberts was present at both of the meetings ''at which the issue of these last named bonds was specially authorized.'' The fact that the defendants claimed a

larger estoppel than the Court allows will not prevent their receiving such benefit from the claim as the case may warrant.

Nor can the majority yield the point regarding the issuance of the bonds. No question is made as to the fullness and exactness of our statement of the facts reported; and we cannot presume that the court below inferred from those facts that the bonds were issued by the receiver without the semblance of an authorization from the court, and in violation of his official duty.

It is a common procedure in equity to permit amendments of the pleadings to correspond with the case as tried. *Harrigan* v. *Bacon*, 57 Vt. 644; *Dwinell* v. *Bliss*, 58 Vt. 353, 5 Atl. 317; *Olmstead* v. *Abbott*, 61 Vt. 281, 18 Atl. 315. The majority think this feature of the estoppel was within the issues of the case as tried, and an amendment of the answer in this respect may be had.

The manner in which the case is presented should be stated more fully. Both sides submit affidavits in support of their respective claims regarding the stock held by the Farmers' Bank. The defendants' brief is accompanied by a transcript of the evidence taken by the master, for examination upon the points made. The orators attach to their brief in reply to the defendants an affidavit of counsel presenting statements made in the brief submitted to the master by defendants, and certain requests for findings submitted by both parties; and further affidavits presenting extracts from the petition for the discharge of the receiver and from the order made thereon. The defendants object to the consideration of the affidavits regarding the statements and requests of counsel, and ask that provision be made for a hearing on the question of fact if such affidavits are considered.

The questions regarding the stock held as collateral, and the question whether the validity of the bonds was raised and argued on the trial, have been disposed of without reference to the affidavits. The only matters covered by the opposing briefs which remain for disposition are those presenting the orators' situation with regard to the 357 shares of stock as to which no inquiry was made, and those relating to the claims of the defendants which depend upon proof of the laws of New York. If the report were to be recommitted for a further hearing on the claims of the defendants, it might be difficult to say why

the benefit of a recommittal should be denied to the orators. A recommittal on the claims of both would involve a retrial of a large part of the case, based wholly on the failure of the parties to anticipate certain lines of decision, as to the correctness of which no question is made. A recommittal on the claims of the defendants would sanction a change to new lines of inquiry, resting wholly on facts known at the time of the trial; and this after the property has been controlled by the defendants during eight years of contest. As the case stands, we think the discretion of the Court should be thrown in favor of closing the litigation.

*Both motions denied.*

WATSON and POWERS, JJ., dissent.

POWERS, J., dissenting. I cannot believe that Roberts is estopped, and I therefore dissent on that point.

1. It is the settled law of this State that an estoppel, to be available, must be pleaded, if, as here, the party relying upon it has an opportunity to plead it. *Sawyer* v. *Hoyt,* 2 Tyl. 288; *Lord* v. *Bigelow,* 8 Vt. 445; *Brinsmaid* v. *Mayo,* 9 Vt. 31; *Isaacs* v. *Clark,* 12 Vt. 692, 36 Am. Dec. 372. Every fact essential to the estoppel must be pleaded with accuracy. *Gray* v. *Pingree,* 17 Vt. 419, 44 Am. Dec. 345. If not pleaded, when the circumstances are such as to require it to be pleaded, the estoppel is waived. *Brinsmaid* v. *Mayo; Isaacs* v. *Clark.*

The defendants evidently had this rule in mind for they attempt to set up an estoppel in their answers. But the estoppel set up in the answers and the estoppel argued before us is not the one found and established by the majority opinion. That Roberts was estopped to assert the *illegality of the issue* of the $18,000 in bonds held as collateral to the receiver's certificates by the Farmers' National Bank had entirely escaped the vigilance of counsel. Indeed, these bonds were of so little consequence or importance in the estimation of the answering defendants that no mention of them is to be found in the answers until after the special master had filed his report. Then, for the first time, though it had filed what is called a "full answer" to the original and supplemental bills, the Farmers' National Bank, in a supplemental answer, makes mention of these bonds.

8

But it contents itself with asserting that it owns them, that they are security for the $14,000, and that they are secured by the trust deed.   There is not a suggestion anywhere in the case, that Roberts is estopped to contest these bonds on the ground that they were unlawfully issued.   The estoppel which the Hughes Company attempts to set up in its answer, and which the Farmers' National Bank attempts to make a part of its answer by reference, is that Roberts stood by and allowed the Hughes Company to buy the property supposing it was getting full title, and allowed the company to sell stock to those who supposed the property was unincumbered, and consequently he will not be allowed to assert his mortgage to their injury.

It was said by this Court as recently as *Conn. Valley Lumber Company* v. *Rowell*, 84 Vt. 25, 77 Atl. 873, that "when parties go into special pleadings, they are confined strictly to the matters put in issue, for the Court tries only such issues as the parties make by their pleadings."   I submit that this rule is applicable though this is a suit in chancery.

The circumstances being such that the estoppel should have been pleaded, no advantage can be taken of it though it may have appeared from evidence introduced to establish the defence set forth in the answers.   *Poole* v. *Mass. Mut. Accident Asso.*, 75 Vt. 85, 53 Atl. 331.

So the majority has gone quite outside of the case made by the pleadings and argument to find that Roberts cannot be heard to say that these bonds were illegally issued and cannot be ahead of his mortgage,—and this for the sake of reversing a decree made upon consideration and not *pro forma*.

I say, then, that the defendants waived the estoppel established by the majority by not pleading it; and they waived it again by not briefing it.   This Court, in chancery appeals, sits only as a court of error.   *Dietrich* v. *Hutchinson*, 73 Vt. 134, 50 Atl. 810, 87 Am. St. Rep. 698.   When reviewing this kind of a decree, it will make every reasonable presumption in favor of its correctness.   It will decline to pass upon questions not raised below and confine parties to the theories there advanced.   Errors should not be sought for outside the record, nor questions settled which were not passed upon below.   In this case, so far as estoppels are concerned, the questions raised below were correctly decided, and I should decline to consider any others.   "The habit that has sometimes prevailed of 'dragging' a case in this

Court, as for something lost, to find a fault that was undiscovered and unheeded in the trial of a cause is ever unavailing to the client, and a deviation from professional propriety and duty'' was Judge Redfield's rebuke in *Sequin* v. *Peterson,* 45 Vt. 255, 12 Am. Rep. 194. I wonder what he would have said if the court had, in his day, not only deliberately reversed a case on a point not raised below, but reversed it on a point not raised at all, either here or below.

2. The decree below having been made upon consideration, it should be sustained by this Court if that result can be reasonably attained. To that end, if a fact essential to the correctness of the decree is omitted from the findings, and such fact can reasonably be inferred from those certified up, it is the duty of this Court to assume that the court made such inference. *Russell* v. *Davis,* 69 Vt. 275, 37 Atl. 746; *Sowles* v. *St. Albans,* 71 Vt. 418, 45 Atl. 1050; *Davenport* v. *Crowell,* 79 Vt. 419, 65 Atl. 557; *VanDyke* v. *Cole,* 81 Vt. 379, 70 Atl. 593; *Perkins & Co.* v. *Perley,* 82 Vt. 524, 74 Atl. 231; *Whitehead* v. *Whitehead,* 84 Vt. 325, 79 Atl. 516. But if the result will be a reversal, this Court should not assume that the court below drew any inference not affirmatively shown by the record, unless the same is a *necessary* inference from the facts found. *Whitehead* v. *Whitehead,* supra; *Adams* v. *Ladeau,* 84 Vt. 464, 79 Atl. 996; *Plumley's Admr.* v. *Plumley,* 84 Vt. 290, 79 Atl. 45. In no event can this Court draw the inference. It is an inference of fact, and it is not for this Court to supply a fact, either for affirmance or reversal. ''It is never the province of a court of errors to deduce inferences of fact from a case agreed, a special verdict, or a report of referees or auditors,'' said this Court in *Abbott* v. *Camp,* 23 Vt. 650. And all along down through our cases runs the idea that if any inferences are to be drawn from the facts certified, they must be drawn by the trial court and not by this Court.

As pointed out in the majority opinion, the report is silent as to the particular circumstances under which these $18,000 in bonds were issued to the Adirondack Trust Company. By whom they were actually pledged is a fact not found. That they were pledged by either the receiver or the corporation is probably a necessary inference. But that it is so plain that they were pledged by the corporation—the theory on which the majority opinion is based—that that conclusion is compelled by the facts

found, I wish to register a very respectful but a most vigorous disagreement.

There may be circumstances of more or less significance indicating this, but it can not be said that they are sufficiently decisive to be determinative of the question.   There is room for reasonable men to differ in their conclusions on this subject,— opposing inferences may be drawn from the facts reported,— and therefore this Court should assume that the court below drew the one which will support the decree.   ''We ought not, for the purpose of reversing a judgment, to read into the finding of facts something which is not there and which is not a necessary inference from the facts found.''   *Adams* v. *Ladeau,* 84 Vt. 464.   To my mind it is vastly more reasonable to infer from the facts found that the receiver, finding the bonds all prepared and ready for delivery, assuming to carry out the previous plan of the corporation, took them and pledged them as collateral to his certificate.   If this view is even possible, under the rule referred to the decree should be affirmed; for no one suggests that Roberts could be estopped by what the receiver did.   In passing upon the possibility of the conclusion suggested, keep in mind the situation:   Here was a corporation shorn of its power to incur debts or pay them; its functions suspended, and its activities paralyzed by the receivership; its assets and affairs had been ordered by the court to be transferred; its corporate powers, so far as now involved, terminated by an implied injunction; and yet to reverse a decree, the majority assumes that the court of chancery, by force of necessity, inferred in the very teeth of the court's order and injunction, that the corporation assumed to issue $18,000 in bonds, thereby increasing its mortgage indebtedness by $14,000.

I ought to say, in passing, that if the bonds were issued by the receiver as I have suggested, they would be wholly invalid.   A receiver has no authority to issue bonds of his own execution, and these were of no validity if executed by the corporation and issued by him.   *Woodford* v. *Darwin,* 3 Vt. 82, 21 Am. Dec. 573, and *Woodworth* v. *Downer,* 13 Vt. 522, 27 Am. Dec. 611, involved the power of a partner to issue promissory notes after dissolution of the partnership.   In principle those cases are much like this.   After the corporation went into the hands of the receiver, corporate action was forbidden, and the

receiver could not give vitality to the unissued bonds by delivering them.

Believing as I do, that it is not only possible but reasonable to assume that the court of chancery inferred from the findings that the bonds were pledged by the receiver, I would so assume and affirm the decree.

3.   I call attention to another assumption made by the majority which I regard as unwarranted: A copy of the bond is found in the corporate records. From this it appears that the bonds were not to be obligatory until duly certified by the trustee. Whether or not the bonds here in question bore this certificate does not appear from the report. Is it a *necessary* inference, from the finding made, that they do bear this certificate? The finding reads: "It appears from the testimony of Eugene R. Norton, and I so find the fact, that there are outstanding $18,000 more of said bonds, which $18,000 were negotiated with Senator Brackett for the Adirondack Trust Company, as security for funds obtained to meet the July pay-roll and some other obligations * *." I admit that the inference would be a natural one, but I deny that it would be a necessary one, unless it can be said as matter of law that bankers never make mistakes.

4.   One who relies upon an estoppel for his protection must prove it. He takes the burden of establishing every fact essential to the estoppel. *Robinson* v. *Morgan,* 65 Vt. 37, 25 Atl. 899; *Royce* v. *Carpenter,* 80 Vt. 37, 66 Atl. 888; *Spear* v. *Spear,* (Me.), 54 Atl. 1106; *Kroll* v. *Close,* (Oh.), 92 N. E. 29, 16 Cyc. 811. One of these essential facts is, that he relied upon the act or conduct specified, and was thereby induced to change his position. 957 Vt. Dig. 38. The master has wholly failed to find this fact in the case in hand. The absence of this finding is recognized by the majority, for it is said in the opinion that "there is no need of a direct finding that the party taking the bonds had knowledge and relied upon any particular feature of Roberts' conduct," and that "it is to be presumed that the holder was induced to purchase by the advantages of the opportunity as presented." Remembering that we are now dealing with *necessary inferences only,* can it be said that the question of a creditor's reliance upon collateral security is *never* open to inquiry? If a perfectly solvent borrower deposits collateral as security for his note does the law conclusively presume that the

lender relies upon the security? Here again the presumption may be very strong, but I cannot believe it is conclusive.

5. There is another fact essential to an estoppel: It must be made to appear that the party seeking to avail himself of it had altered his position to his prejudice,—has been misled to his injury. *Woolen* v. *Edson,* 35 Vt. 214; *Earl* v. *Stevens,* 57 Vt. 474; *Goodell* v. *Brandon National Bank,* 63 Vt. 303, 21 Atl. 956, 25 Am. St. Rep. 766. An estoppel is protective, only, and its whole office is to shield one from a loss which, but for it, he could not escape. *Smith* v. *Powell,* 98 Va. 431, 36 S. E. 522; *Gerstadengen* v. *Hartzell,* 9 N. Dak. 268, 83 N. W. 230, 81 Am. St. Rep. 575; *Lindsay* v. *Cooper,* 94 Ala. 170, 16 L. R. A. 813, 11 So. 325, 33 Am. St. Rep. 105; *Atkins* v. *Payne,* (Penn.) 50 Atl. 158; *Schwab* v. *Edge,* (Penn.) 64 Atl. 80; *Stewart* v. *Parnell,* (Penn.) 23 Atl. 838. It is plain enough to me that the Farmers' National Bank is in no danger here. It cannot lose a cent by this transaction. The corporation is behind their loan. Nobody claims that the corporation is insolvent, and if they did, it sufficiently appears otherwise by the record. In the first place, it is shown that the trustee in bankruptcy of Hughes came into possession of 1,645 shares of the stock of the corporation, which he sold at auction in June, 1904,—long after all these bonds and receiver's certificates had been issued—to one who knew all about the liabilities of the corporation, including the Roberts debt, for $33,900.00. One cannot believe that the Nortons were paying more than $20.50 a share for the stock of an insolvent corporation, when they knew all about its assets and liabilities. Moreover, the master finds that the value of the property conveyed to the corporation by Hughes was, at the time the stock was bid off for the Nortons, $95,000, and the liabilities of the corporation then amounted to $72,000, to which should be added the notes here sought to be foreclosed. The margin of solvency thus established is not a very large one, I admit, but is apparently safe. Not only this; it appears that after the Nortons acquired their interest, the receivership was terminated and the corporation resumed control of its affairs. Does anybody believe that the Court relinquished its control without making any provision for the payment of the sums represented by the receiver's certificates which had been issued by its authority? Of course not. But we are not left to conjecture on this point. The corporation says in its answer that it "is

required and compelled" to pay the expenses of the receivership, and that they amount to $18,000. The Farmers' National Bank is amply protected without resort to the bonds; but the orators are not creditors of the corporation; they only hold the obligations of Hughes. So their only protection depends upon the availability of their security, and if they lose their mortgage, they lose all. The debt is an honest one. Ignorance rather than dishonest purpose is responsible for the present situation of the orators. And if it be urged that though the bank might escape loss as suggested, the burden would then fall upon the corporation, my reply is that there is just where it ought to fall, for it took with full notice, as did those owners who are not protected by the majority opinion.

6. It is held by the majority that the Farmers' National Bank took the bonds with notice of the illegality of their issue. How, then, can Roberts be estopped from asserting it? What has he ever said or done to mislead the bank or anybody else on *that* subject? Assuming that the corporation issued them, what did he have to do with it? The legality of the issue of the bonds is a subject on which Roberts has never spoken, either expressly or by implication. But it is said by the majority that the corporation had the benefit of this loan,—that its avails went to pay its debt,—and therefore the corporation is estopped to deny the validity of the bonds pledged to secure it; and that Roberts being a director, is also estopped to deny it. I do not agree that the corporation is estopped. The Adirondack Trust Company and the Farmers' National Bank knew all about it. They knew every single material fact. Their mistake, if there was any, arose from their ignorance of their legal rights,—just as Roberts did when he omitted to record the mortgages. They knew they were dealing with a receiver,—that this corporation was in the hands of the court. What *fact* did the corporation suppress, that it should now tie the hands of this honest creditor? Knowing these facts, they were bound to know that the corporation could not make a legal issue of bonds, and that the receiver could not. Indeed, this is the view of the majority, and the very ground on which the invalidity of the bonds in the hands of the bank is put in the opinion.

One cannot be estopped when the other party knows the truth. Deception is of the very essence of estoppel; and this deception must be as to material facts, for one knowing the facts

is presumed to know the law. If estoppels are ever available to relieve from a mistake of law, this case affords no opportunity for the application of one of that class. Without admitting then, that Roberts' estoppel would follow that of the corporation without some participation in the wrongful act, I insist that the corporation was not estopped because the bank knew the truth. *Boynton* v. *Braley*, 54 Vt. 92; *Pond* v. *Pond's Est.*, 79 Vt. 359, 65 Atl. 97, 8 L. R. A. (N. S.) 212; Beach Eq. Jur., §1108; *Steele* v. *St. Louis Smelting & Refining Co.*, 106 U. S. 447, 27 L. Ed. 226, 1 Sup. Ct. 389; *Sanborn* v. *Van Duyne*, 90 Minn. 215; *Lash* v. *Rendell*, 72 Ind. 475; *Estis* v. *Jackson*, 111 N. C. 145, 16 S. E. 7, 32 Am. St. Rep. 784; *Blodgett* v. *Perry*, 97 Mo. 263, 10 S. W. 891, 10 Am. St. Rep. 307.

It necessarily follows that Roberts' representations about the condition of the title arising from his failure to record or give notice of his mortgage becomes entirely immaterial. For if the bonds are invalid in the hands of the bank, as the majority says, and Roberts is allowed to say so, it is of no possible consequence whether they are—or would be if legally issued—a first or second lien on the property. They are unenforceable, and Roberts' implied representation that the title was clear was utterly harmless to the bank.

It requires no very careful study of this case to discover that the result reached by the majority not only does great injustice to Roberts, but accomplishes no benefit to the Farmers' Bank in whose behalf the estoppel is established. The corporation and its owners reap the benefit, though they took with notice, and are now enabled, by shielding themselves behind an estoppel to which they are strangers, to avoid an encumbrance valid as to them, and thus escape the payment of the debt secured thereby. It cannot be that in *foro conscientiae* such a rank injustice should be tolerated.

*I should affirm the decree.*

WATSON, J., concurs in this dissent.