W.E. Andrews, A Div. of Moore Wallace N. Am., Inc. v. 1 Cornell, Inc., No. 278-5-08 Wmcv (Wesley, J., Apr. 5, 2011)

[The text of this Vermont trial court opinion is unofficial. It has been reformatted from the original. The accuracy of the text and the accompanying data included in the Vermont trial court opinion database is not guaranteed.]

**STATE OF VERMONT**
**SUPERIOR COURT**

| | |
|---|---|
| **W.E. ANDREWS, A DIVISION OF MOORE WALLACE NORTH AMERICA, INC.; 802 CREATIVE PARTNERS, INC. AND PIERCE WILLIAMS D/B/A PIERCE WILLIAMS PRODUCTIONS**<br> Plaintiffs<br><br> **v.**<br><br>**1 Cornell, Inc.; 2 Cornell Corp and The Haystack Club; and Robert Foisie**<br> Defendants | **WINDHAM UNIT, CIVIL DIVISION**<br>**Docket No. 278-5-08 Wmcv** |

**FINDINGS OF FACT, CONCLUSIONS OF LAW**
**& ORDER**

This cause was tried to the Court on March 4, 2011. Plaintiffs were represented by Karl Anderson, Esq. Defendant 1 Cornell, Inc. was represented by David Dunn, Esq.

Defendant 2 Cornell Corp, doing business as The Haystack Club, was served on June 14, 2008 but failed to answer, or otherwise defend. Default is entered against 2 Cornell Corp, and judgment as set forth below.

Defendant Robert A. Foisie was never served, and thus the complaint is dismissed against him.

The record was kept open until March 18 for any supplemental proposed findings and conclusions, and each party filed supplemental proposals on March 18, 2011.

The following findings of fact were established by a preponderance of the evidence.

*Findings of Fact*

1. Alt Charities, Inc., formerly known as 1 Cornell, Inc., is a Nevada corporation entirely owned and controlled by Defendant Robert Foisie.

2. 2 Cornell Corp was a Vermont corporation entirely owned and controlled by Defendant Robert Foisie. According to the Vermont Secretary of State, 2 Cornell Corp was no longer registered as a corporation at the time of the trial, having been terminated on March 7, 2009.

3. Defendant Robert Foisie is likely a resident of Florida. He is an investor with significant interests in the real estate and ski and golf operations of the resort in Wilmington, Vt. formerly known as Haystack. Though named as a defendant, Mr. Foisie has never been served with the complaint in this case.

4. "The Haystack Club" is a tradename last registered to Defendant 2 Cornell Corp., and was so registered during the transactions which are the subject of this suit.

5. Plaintiff 802 Creative Partners, Inc. (CPI) is a Vermont corporation, and successor to Sullivan Brownwell Davies (SBD). SBD contracted with The Haystack Club to perform and coordinate marketing efforts related to a plan to convert the Haystack Ski Resort into a members-only facility.

6. Plaintiff W.E. Andrews (WEA) is a division of Moore Wallace North America, Inc., registered as a corporation under the laws of Delaware, with a principal place of business in Chicago, Ill. After being contacted by SBD, WEA provided high-quality printing services for The Haystack Club's marketing efforts.

7. Plaintiff Pierce Williams, d/b/a PCW Productions (PCW) provided video services for the Haystack Club, after being contacted by SBD.

8. Thomas Cross is currently President and Secretary of Alt Charities, Inc., formerly 1 Cornell, Inc. He was also previously an officer in 2 Cornell Corp., from which he resigned on January 26, 2009.

9. Mr. Cross has a close and long-standing business relationship with Robert Foisie. Currently, he is the principal and sole owner in Elm Tree Associates, a management services and real estate consulting firm primarily engaged in providing services to entities owned by Mr. Foisie.

10. Mr. Cross was involved in the transaction on June 27, 2005 in which American Ski Ltd, the owners of Mount Snow Ski Resort, sold the Haystack Ski Resort to companies established by Mr. Foisie. 1 Cornell, Inc. took title to all the real estate involved in the conveyance. 2 Cornell Corp. took title to all the personal property. According to Mr. Cross's credible testimony, the use of different corporations to hold the real property separately from personal property, and/or responsibility for other operations, is very typical of real estate development ventures generally and ski resort holdings in particular.

11. As conceived by Mr. Foisie, Mr. Cross and others of their development group, Haystack Resort would be marketed as a private members-only facility. The plan envisioned the development and sale of vacation homes, as well as the sale of memberships in The Haystack Club. Memberships would include skiing, golf and equestrian privileges, together with the use of other Club facilities. Memberships would be marketed separately from second home sales, but the purchase of a vacation property would require the associated purchase of a membership interest in The Haystack Club.

12. Mr. Foisie and Mr. Cross estimated that they would need to sell at least 200 memberships to allow The Haystack Club to achieve viability. No more than 50-60 memberships were sold.

2

13. David Dillon had prior experience as the executive director of the Vermont Ski Areas Association when he was hired by Mr. Foisie in December 2005 to manage The Haystack Club. He had been employed for several months before learning that The Haystack Club was a tradename owned by 2 Cornell Corp. His salary was paid on a checking account designated to The Haystack Club, with no obvious indication of any affiliation with 2 Cornell Corp.

14. Although Mr. Dillon was involved in daily affairs of The Haystack Club for somewhat longer than a year, he claims to have understood little regarding the corporate structure established by Mr. Foisie for the development of the members-only resort. Nonetheless, he acknowledges that 1 Cornell Inc. held the real estate, and that 2 Cornell Corp. owned the tradename "The Haystack Club". He is unsure whether he was an officer, or any other designated corporate official, for either corporation. He believes he may have seen a document indicating that he had signed an acknowledgment for filing with the Secretary of State as being the president of 2 Cornell Corp.

15. Mr. Dillon was eventually discharged by The Haystack Club. He brought a lawsuit for breach of employment contract, but later caused it to be dismissed without prejudice.

16. Due to Mr. Dillon's previous acquaintance with the work of SBD on behalf of the Vermont Ski Area Association, he recommended its services to Mr. Foisie in connection with marketing The Haystack Club. Mike Hickey, one of SBD's principals, became SBD's liaison to The Haystack Club.

17. SBD was engaged on behalf of The Haystack Club after a "branding meeting" held between Mr. Hickey and representatives of The Haystack Club, including Mr. Foisie, Mr. Cross and Mr. Dillon. As a result of the meeting, SBD undertook to design and produce a "viewbook" [Ex. 22 & 22A] to be used with prospective purchasers of membership in The Haystack Club.

18. During his negotiations with The Haystack Club on behalf of SBD, no one ever explained to Mr. Hickey that The Haystack Club was a tradename of 2 Cornell Corp.. No one expressly acknowledged that the real property on which Club facilities existed, or would be created, was separately owned by 1 Cornell, Inc., which also held title to all other real property interests involved with prospective development of second homes for members of The Haystack Club.

19. As produced through the efforts of SBD, "the viewbook" represents an amalgam of stock photographs and architectural renderings, depicting an imagined resort experience, most of which would require the construction, or significant improvement, of facilities not yet in existence. The "viewbook" is titled "Haystack Club" on a logo applied to the front cover and designed by SBD. In addition to the amenities associated with membership, the "viewbook" describes real estate ownership options, including "country homes", "mountain villas", or "suites at Haystack Club Hotel".

3

20. Under heading "The Privileges of Membership", the "viewbook" suggests that membership will be limited to "approximately 900 families" who will all "enjoy the same access to Haystack Club amenities and services, however 450 memberships are reserved for Haystack Club residence owners, who are assured of membership privileges."

21. On the final page of the "viewbook", a disclaimer states that it is not an offering for sale, that the illustrations and photographs are "renderings or representative likenesses that may not be built", that square footages are approximate, and other schematics for homes are "conceptual only", and that the "developer reserves the right to make changes without notice". Contact is invited through a website: www.haystackclub.com. Inside the "viewbook", Mr. Foisie is described as Haystack Club's "founder". Otherwise, no one is identified as "the developer". The "viewbook" makes no reference to either 2 Cornell Corp. nor 1 Cornell, Inc.

22. There was no written contract between SBD and The Haystack Club. Most of the work was conceptualized in meetings involving Mr. Dillon and/or Mr. Foisie. According to the credible testimony of Mr. Dillon, Mr. Foisie exercised careful oversight authority as to the efforts to "brand" and market The Haystack Club, especially regarding the layout and production of the "viewbook".

23. There is conflicting testimony as to the extent to which purchase orders were involved as a usual and customary aspect to the relations between SBD and The Haystack Club. Mr. Cross states that early in the relationship SBD was informed that work should not be performed unless it was the subject of a prior purchase order. Mr. Hickey acknowledges that certain work had been framed and paid according to such a process, but denies that it was ever applied as a rigid requirement. Mr. Dillon's testimony confirms that of Mr. Hickey.

24. In response to SBD's prior invoices, The Haystack Club had paid it $92,570.70 before payment for amounts referenced in a March 2008 invoice went unpaid. The March 2008 invoice reflects an unpaid balance of $37,489.27, the amount CPI demanded by its complaint here, and which is justified by the evidence. The work referenced in the March 2008 statement had been previously referenced in invoices dated Dec. 31, 2006 or Jan. 31, 2007. These invoices specify work related to uniforms, windshield stickers, member cards, membership certificates, envelope stickers, sales office panels, inquiry/response postcards, letterhead and envelopes, and floor plans.

25. Other than the "floor plan" inserts, invoices seeking reimbursement for all work related to the content of the "viewbook", including designing the Haystack Club logo, had been paid prior to the invoices carried forward to the unpaid balance as set out in the CPI's March 2008 statement.

26. Based on SBD's prior association with WEA, and its recommendation for the quality of its printing work, The Haystack Club contracted with WEA to print "the viewbook". Before undertaking the job, and pursuant to its standard practice of seeking

4

credit references, WEA required The Haystack Club to provide credit information on its standard form.

27. On Nov. 13, 2006, The Haystack Club returned WEA's completed Credit Approval Request Form. In the space requesting designation of The Haystack Club's parent company, 2 Cornell Corp is specified. Based on its review of the information on the Credit Approval Request Form, including further information developed from checking references, WEA agreed to perform work for The Haystack Club on credit with an approved credit limit of $100,000.

28. WEA was engaged strictly as a print jobber. It was not involved in the layout, text editing, or factual representations associated with "the viewbook". There is no evidence that WEA made any reliance on the representations in "the viewbook" in deciding whether to extend credit to The Haystack Club, or in considering any terms for undertaking work on behalf of The Haystack Club.

29. On Dec. 31, 2006, WEA submitted separate invoices for: i) envelopes and mailing boxes in the amount of $23,126; ii) brochures in the amount of $1,138.53; iii) envelopes in the amount of $289.20; iv) 5,000 viewbooks in the amount of $69,115. On Feb. 28, 2007, WEA submitted an invoice for $9,917.49 for freight. WEA is owed $103,583.92 as of April 17, 2007 for unpaid services.

30. Plaintiff Pierce Williams did not appear at trial. Mr. Cross acknowledged that he would not dispute the larger of Williams' invoices, $5,312, though he "had issues" with the other, $450. There is no evidence bearing on Williams understanding of the relationship between The Haystack Club, 2 Cornell Corp., and/or 1 Cornell, Inc., or any of the principals of The Haystack Club, or any of the corporate entities involved in this litigation.

31. The Haystack Club website is still accessible. Some of the content on the homepage is derived from "the viewbook". Information relative to potential purchases of real estate is available on the website. Mr. Cross is unaware of who pays the web designer or the servicer. He acknowledges that it can not be 2 Cornell Corp. since it is defunct and without assets.

32. In support of their claim that Mr. Foisie's corporations regularly failed to maintain formal distinctions between their activities, Plaintiffs established the following:

a. In its letter agreement with 1 Cornell, Inc. to construct a new gatehouse and provide other construction services, the Pizzagalli Corporation referred to work as being associated with "the Haystack Club project", and Pizzagalli sued 1 Cornell, Inc. d/b/a The Haystack Club when it was not paid;

b. In defending the suit brought by Pizzagalli, counsel for defendants entered his appearance on behalf of "1 Cornell, Inc. d/b/a The Haystack Club" ;

5

c. A survey plat dated 9/21/2006 submitted to the Town of Wilmington as part of 1 Cornell, Inc.'s subdivision application referred to the project as "Property of Haystack Club";

d. certain fees associated with permitting activities in connection with real estate development of the former Haystack Mountain resort were paid by checks written on The Haystack Club account;

e. a tractor purchased in the name of 2 Cornell Corp was subsequently used by a different Foisie corporation which operates the Haystack golf course, and the original down payment for the tractor had been accomplished through Mr. Foisie's personal credit card.

33. There is no evidence that any Plaintiff had been aware of the events specified in the preceding paragraph, or relied upon assumptions stemming from such awareness in fashioning the commercial relationships which are the subject of this suit.

34. At its inception, it is likely that the stated capital of 2 Cornell Corp. was limited to the value of the personal property transferred by American Ski, Ltd at the time of the sale of the former Haystack resort, together with such funds as may have been contributed by Mr. Foisie. The evidence is inadequate to allow anything but speculation as to the combined value of 2 Cornell Corp.'s capitalization.

35. 2 Cornell Corp did not generate income. Its liquidity and capacity to pay for the activities necessary to developing The Haystack Club as a viable enterprise depended at all material times on deposits by Mr. Foisie into The Haystack Club's bank accounts, in the form of loans to 2 Cornell Corp. As established by Mr. Cross' testimony, Mr. Foisie made substantial loans toward this effort, including the funds used to make initial payments toward invoices submitted by Plaintiffs. However, at a point when sales of memberships proved disappointing, and Mr. Foisie was unwilling to advance additional funds, The Haystack Club and its parent company, 2 Cornell Corp, became insolvent. The corporation was terminated without evidence of any dissolution proceedings.

*Discussion*

Plaintiffs seek to impose liability upon 1 Cornell, Inc. (now Alt Charities) for the value of their unpaid services under the doctrine of "piercing the corporate veil", or, in the alternative, upon a theory of unjust enrichment.

*Agway v. Brooks*, 173 Vt. 259 (2001) remains Vermont's leading case on "piercing the corporate veil". In that case, an action for the cost of animal feed brought by the supplier against the owners of a dairy farm, the trial court rejected the claim that the debt had been solely incurred by the corporation which operated the farm. Although there was evidence that plaintiff had known of the corporation, and originally supplied feed on credit based on an account opened in the name of the corporation, the trial court imposed liability on the shareholders directly. The court found that they owned all the

6

farm assets, that the corporation had no assets, and that the shareholders "had failed to respect the corporate form". *Id.* at 261. They moved money between the business and personal accounts without corporate resolutions or documentation, loaned money from the corporation without notes and repaid with receipts. Without finding fraudulent intent, the court nonetheless concluded that the shareholders "purposely set up the corporation without assets and ran it without a profit", creating an undercapitalized corporation with the intention of isolating any business debt from personal assets. *Id.* at 262. Considering the business relations between the parties, the trial court found that defendants had given plaintiffs the reasonable belief that they were acting on their personal behalf, rather than on behalf of a corporation. *Id.*

On appeal, the Supreme Court noted that while "shareholders are not generally liable for the debts of the corporation, shareholders can be held liable where the corporate form has been used to perpetrate a fraud or to shield the shareholders' assets against the legitimate claims of a creditor." *Id.* citing *Winey v. Cutler*, 165 Vt. 566, 567 (1996); *Roberts v. W.H. Hughes Co.* 86 Vt. 76, 88 (1912). In its review on appeal, the Court found the evidence sufficient to sustain the trial court's judgment. Finding it doubtful that a court would have equitable cause to pierce the corporate veil "merely because a closely held corporation did not follow corporate formalities", the Court concluded that the evidence went beyond such a demonstration because "Brooks Farm, Inc. was a mere corporate strawman for the Brooks Brothers Farm partnership…without assets, capital, or purpose beyond evading contract liability."

The present case, while resembling the circumstances in *Brooks* to a certain extent, departs significantly from the factual situation that supported the wholesale rejection of the corporate form in that case. First, Plaintiffs here, having failed to obtain service over Robert Foisie, are not really seeking to "pierce the corporate veil" to reach 2 Cornell Corp's shareholder. Rather, they seek to impose liability on a different corporation also owned by Mr. Foisie, based on his joint control and the interrelated involvement of both corporations in the venture to transform Haystack into a membership resort. The equitable claim for accomplishing this result resembles plaintiff's argument in *Brooks*: Mr. Foisie was not always scrupulous in maintaining the distinctions between accounts and activities designated to his separate corporations, and 2 Cornell Corp was undercapitalized while 1 Cornell Inc. retained the substantial portion of the assets acquired from American Ski Ltd.

Nevertheless, the evidence for misuse of the corporate form here is considerably less compelling than found in *Brooks*. The claimed irregularities in maintaining corporate distinctions are quite minor. More importantly, there is no evidence that any of the Plaintiffs knew of the deviations from proper corporate accounting or recordkeeping, or relied in any way on the blurring of the lines. Furthermore, while it can be argued that 2 Cornell Corp was "undercapitalized", the actual amount of its capitalization was not established by the evidence. Certainly, it began its existence owning the personal assets transferred from the sale by American Ski Ltd. In addition, Mr. Foisie made numerous loans to the corporation – again, the exact amount cannot be determined from the evidence. Moreover, unlike *Brooks*, there is no evidence that Mr. Foisie has carelessly

intermingled his personal finances with either of his corporations. In sum, the Court concludes that there would have been insufficient evidence to justify "piercing the corporate veil" to reach Mr. Foisie as shareholder, and even less basis to impose liability on a second corporation - albeit related to these events - which he controls.

Notwithstanding the conclusion that, contrary to Plaintiffs' argument, the holding in *Brooks* is not on all-fours with the facts here, and does not squarely control the outcome here, the Court's inquiry is not at an end. As Defendant maintains, the relations between each Plaintiff and The Haystack Club stand in different postures, and the facts bear further examination in light of those differences.

As between SBD, now CPI, and The Haystack Club, the question of Plaintiff's "reasonable belief" as to the guarantors of payment for its services, as with *Brooks*, deserves scrutiny. Neither Mr. Foisie, nor Mr. Cross, nor Mr. Dillon – all acting on behalf of The Haystack Club – ever informed Mr. Hickey of SBD that 2 Cornell Corp was the corporate owner of the tradename "The Haystack Club", or that SBD should look to that corporation for payment for its services. Indeed, SBD's initial invoices were paid by checks written on an account in the name of "The Haystack Club", with no indication that it was a corporate account controlled by a separately-named entity. Furthermore, nothing in SBD's dealings with The Haystack Club could reasonably have put it on notice that its contractual relations had actually been transacted between itself and 2 Cornell Corp. To the contrary, based on the descriptions incorporated in "the viewbook", the production of which was the largest of the projects undertaken by SBD for The Haystack Club, it was reasonable for SBD to assume that The Haystack Club included all the real estate interests being marketed with the memberships in the Club.

SBD's relationship to The Haystack Club, and the individuals and corporations with then-undisclosed ties to its activities, closely resembles the contractual circumstances discussed in *Douglas v. O'Connell*, 139 Vt. 427, 429 (1981). In that case, the Supreme Court overturned a trial court judgment for defendant, which had concluded that he was not liable to pay for plaintiff's construction efforts because the contract had been made between plaintiff and a corporation. The trial court had accepted defendant's contention that, when he signed the contract in the form "Timothy O'Connell Top of the Square", he was doing so only on behalf of Top of the Square, Inc. However, the Supreme Court concluded that defendant failed to make adequate disclosure, either of his agency or of the corporate nature of his principal. Such disclosure is essential to avoid individual liability.

> The burden is on the agent to disclose his agency and to identify his principal. This burden is not met by the mere use of a trade name such as Top of Square. Therefore, the trial court's conclusion that the identity of the principal had been "plainly disclosed" is not supported by the facts.

*Id.*

Likewise, here, SBD could not have known that those purporting to engage its services on behalf of The Haystack Club were actually acting on behalf of 2 Cornell Corp. That was never stated, and SBD was no more bound to look beyond the use of a

8

trade name than was the plaintiff in *Douglas v. O'Connell.* Regardless of the ownership of the trade name, it is plain that Mr. Foisie, Mr. Cross and Mr. Dillon were engaged in marketing efforts designed to benefit both 2 Cornell Corp and 1 Cornell Inc. Under all the circumstances, when viewed from the perspective of SBD's reasonable assumptions regarding the nature of its contractor, the Court concludes that Foise, Cross and Dillon were acting on behalf of both corporations when contracting with SBD, and both are jointly and severally responsible for the unpaid invoices.

WEA's claim stands on different footing. It specifically required a credit disclosure, which The Haystack Club provided showing its corporate parent as 2 Cornell Corp. Armed with this information, WEA conducted its standard check of credit references and agreed to extend credit in the amount of $100,000. Plaintiff, itself a subsidiary in a much larger corporate structure, is hardly in a position to claim that it was the victim of any misrepresentation; indeed, the testimony of its witness included no such claim. As regards WEA's claim, the Court concludes that there is no basis in equity to depart from the normal rule that a corporation's liabilities are not normally imposed on its shareholders, including other corporate entities controlled by its shareholders. *Agway v. Brooks*, 173 Vt. at 262. Rather, this was an arms-length commercial transaction between two corporations with sufficient information to allocate risks as the circumstances may have dictated, in the prudent exercise of the business judgment of each. WEA could have structured the transaction differently, but the law is not required under the facts here to impose a structure other than the one chosen by the contracting parties. The same rationale applies to defeat WEA's alternative theory of liability based on unjust enrichment. There is scant evidence as to any benefit to 1 Cornell Inc.; more importantly, however, there is no manifest injustice arising from the commercial context just described. See, *Center v. Mad River Corp.* 151 Vt. 408, 412 (1989).

Finally, there is insufficient evidence from which to deduce the possible agency relations that might have affected Plaintiff Pierce Williams' claim against 1 Cornell Inc. One could speculate that Mr. Williams experienced the same sort of lack of disclosure and blurred agency capacities that characterized the contracting context between The Haystack Club and SBD. However, unlike Mr. Hickey, Mr. Williams did not appear to provide any details about how the contractual arrangements came into being. Thus, Mr. Williams' claim against Defendant 1 Cornell Inc. must fail for lack of proof of any contractual relationship, or any other basis for imposing liability.

**ORDER**

**WHEREFORE** it is hereby **ORDERED:**

As to the claims of Plaintiff 802 Creative Partners Inc.:
**PLAINTIFF'S JUDGMENT** against Defendants 1 Cornell, Inc. and 2 Cornell Corp is issued in the amount of $37,489.27 as of 1/31/2007, with interest accrued until the date of trial in the amount of $18,401.58, and judgment interest thereafter at $12.33 per diem.

As to the claims of Plaintiff W.E. Andrews:

**PLAINTIFF'S JUDGMENT** against Defendant 2 Cornell Corp is issued in the amount of $103,583.92 as of 2/28/2007, with interest accrued until the date of trial in the amount of $49,890.56, and judgment interest thereafter at $34.05 per diem.

**DEFENDANT'S JUDGMENT** is issued in favor of 1 Cornell Inc., and the complaint is **DISMISSED WITH PREJUDICE.**

As to the claims of Plaintiff Pierce Williams:

**PLAINTIFF'S JUDGMENT** against Defendant 2 Cornell Corp is issued in the amount of $5,762 as of 12/26/2006, with interest accrued until the date of trial in the amount of $2.896.47, and judgment interest thereafter at $1.89 per diem

**DEFENDANT'S JUDGMENT** is issued in favor of 1 Cornell Inc., and the complaint is **DISMISSED WITH PREJUDICE.**

All claims against Robert A. Foise are **DISMISSED** for lack of service.

Dated at Newfane this        day of April, 2011.

_____
John P. Wesley
Superior Court Judge